PUBLISH

UNITED STATES COURT OF APPEALS

**Filed 7/23/96**

TENTH CIRCUIT

———

AIRPORT NEIGHBORS ALLIANCE, INC.,)
a New Mexico corporation,           )
               )
     Petitioner,         )
               )
    v.           )     No. 95-9503
               )
UNITED STATES OF AMERICA;    )
FEDERICO PENA, Secretary of    )
Transportation; DAVID R. HINSON,   )
Administrator, Federal Aviation    )
Administration; CYNTHIA RICH,    )
Assistant Administrator, Airports    )
Division; ALBUQUERQUE, CITY OF,   )
               )
     Respondents.      )

———

Petition for Review from a Final Order of the
Federal Aviation Administration

———

Eric Ames of the Western Environmental Law Center, Taos, NM, (Grove T. Burnett, of the Western Environmental Law Center, with him on the brief) for Petitioner.

Michael M. Conway of Hopkins & Sutter, Chicago, IL (Mark G. Shoesmith, of the Albuquerque City Attorney's Office, NM, and Michael Schneiderman, of Hopkins & Sutter, Chicago, IL, with him on the brief) for Respondent City of Albuquerque.

Peter R. Steenland, Jr., U.S. Department of Justice (Lois J. Schiffer, Asst. Atty. General, and Andrew C. Mergen, Attorney, U.S. Department of Justice, and Daphne A. Fuller, Eric Anderson and Loretta Barlow, Federal Aviation Administration, with him on the brief) for the Federal Respondents.

_____

Before **EBEL**, Circuit Judge, **McWILLIAMS**, Senior Circuit Judge, and **LUCERO**, Circuit Judge.

_____

**EBEL**, Circuit Judge.

_____

The number of passengers flying in and out of New Mexico's sole commercial jet airport has been increasing during the 1990s, and the City of Albuquerque--home to the Albuquerque International Airport--projects the passenger traffic at the Airport to continue a steep ascent. Anticipating a growing influx in passengers, the City proposed to upgrade Runway 3-21 at the Albuquerque International Airport in order to enable it to accommodate large aircraft such as commercial jets. The Federal Aviation Administration, pursuant to the National Environmental Policy Act, prepared an Environmental Assessment

-2-

("EA") for the proposed action and, following public comment, issued a Decision and Order which approved the runway expansion and incorporated a Finding of No Significant Impact to the environment ("FONSI"), foreclosing Respondents' need to prepare an Environmental Impact Statement ("EIS"). Petitioner Airport Neighbors Alliance Inc., an assembly of neighborhood associations surrounding the Airport, challenges the FAA's decision to issue a FONSI, and argues that the agency should have prepared an EIS. Airport Neighbors considers the EA inadequate for: (1) failing to consider cumulative impacts associated with the Runway 3-21 upgrade; (2) failing to consider a reasonable range of alternatives to the Runway 3-21 upgrade; and (3) failing to analyze adequately noise and safety effects related to the Runway 3-21 upgrade. For the reasons stated below, we AFFIRM the FAA's decision to issue a FONSI.

## Background

The Airport is located four miles south of Albuquerque's central business district and is surrounded by residential neighborhoods to the north, Kirtland Air Force Base to the east and southeast, undeveloped land to the south, and industrial operations to the west. The Airport is served by four runways. At the time the Runway 3-21 upgrade was proposed, only two of the runways--Runway 8-26 and Runway 17-35--could be used by commercial jet aircraft. Runway 8-26 was the primary runway, with Runway 17-35 being used less than six percent of the year.

-3-

The other two runways--Runway 3-21 and Runway 12-30--were of insufficient width, length, and pavement strength to accommodate air carrier jet traffic.

In December 1993, the City, in anticipation of a projected increase in passenger use during the upcoming decades, announced a Master Plan for the Airport which sets forth a construction schedule in three phases over 20 years. The components of the Master Plan include: upgrading Runway 3-21 to accommodate commercial jet traffic; reconstructing Runway 8-26; closing Runway 17-35; expanding the terminal facility; constructing a second parking structure; building a new cargo services building; expanding surface access roads; and relocating rental car facilities.

At the same time the City issued the Master Plan, the FAA issued a draft EA for upgrading Runway 3-21, which is the proposed action being challenged here. Specifically, the proposal included shifting the runway's centerline 50 feet to the southeast, lengthening the runway to 10,000 feet, widening the runway to 150 feet, and increasing the pavement strength to accommodate commercial jet and military aircraft. Respondents characterize the two purposes of the proposed action as: (1) insuring the airport's ability to accept jet air traffic while the primary runway, Runway 8-26, is closed for reconstruction; and (2) accommodating the projected growth in air traffic at the Airport. On July 28, 1994, the FAA finalized the EA, and it issued the FONSI in October, 1994. Work

-4-

on the Runway 3-21 upgrade project since has been completed to the point that commercial aircraft currently use Runway 3-21 for takeoffs and landings.[1] Airport Neighbors now challenges the FAA's decision to issue a FONSI, arguing that the EA was inadequate because it failed to address the cumulative impacts of the proposed action, several alternatives to the proposed action, and noise and safety concerns.

**Mootness**

Because construction on Runway 3-21 has been substantially completed, we must consider whether Airport Neighbors' appeal is now moot. Although both parties stated at oral argument they do not consider this action moot, we are under an independent obligation to examine our own jurisdiction. Clajon Prod. Corp. v. Petera, 70 F.3d 1566, 1574 n.14 (10th Cir. 1995) (citing FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231 (1990)). Ordinarily, a NEPA claim no longer presents a live controversy when the proposed action has been completed and when no effective relief is available. See Neighborhood Transp. Network, Inc. v. Pena, 42 F.3d 1169, 1172 (8th Cir. 1994); Sierra Club v. Penfold, 857 F.2d 1307, 1318 (9th

---

[1] Although the Runway 3-21 construction had not been completed at the time the parties submitted their briefs, the City filed a motion for leave to file a status report instanter prior to oral argument, which we now grant. The status report consists of an affidavit by Dennis A. Parker, assistant aviation director for the City. In the affidavit, Parker states that Runway 3-21 opened for air carrier use on August 25, 1995 and that remaining aspects of the project were substantially completed on December 17, 1995.

Cir. 1988). However, courts still consider NEPA claims after the proposed action has been completed when the court can provide some remedy if it determines that an agency failed to comply with NEPA. See National Parks and Conservation Ass'n v. FAA, 998 F.2d 1523, 1524 n.3 (10th Cir. 1993) (finding case challenging airport construction not moot after construction was completed when restrictions could be placed on the use of an airport); Burbank Anti-Noise Group v. Gold-schmidt, 623 F.2d 115, 116 (9th Cir. 1980) (holding action challenging already completed sale of airport not moot when the actions could be "undone"), cert. denied, 450 U.S. 965 (1981).

We do not believe that the present case is moot because if we find that the Respondents failed to comply with NEPA, we could order that the runway be closed or impose restrictions on its use until Respondents complied with NEPA. The majority of environmental concerns surrounding Runway 3-21 relate not to the actual physical construction of the enlarged runway, but rather to the new patterns of commercial jets using the runway. For example, the EA discusses in detail the impacts that the operation of jets using the runway will have on noise, air quality, and water quality. In contrast, the EA only briefly addresses the construction impacts and considers such impacts to be only temporary. Therefore, although the fact that the upgrade of Runway 3-21 has been completed renders moot any claim relating to the construction of the runway, we still may consider

-6-

whether Respondents complied with NEPA by adequately addressing the environmental impacts resulting from the enhanced use of the runway.

## The NEPA Framework

NEPA requires that federal agencies draft an EIS in conjunction with "every recommendation or report on proposals for … major Federal actions significantly affecting the quality of the human environment.…" 42 U.S.C. § 4332(C). Under NEPA, an agency generally prepares an EA of the proposed action to guide whether it should prepare an EIS or issue a FONSI. 40 C.F.R. 1501.4(a)-(c). If the agency determines that its proposed action may "significantly affect" the environment, the agency must prepare a detailed statement on the environmental impact of the proposed action in the form of an EIS. City of Aurora v. Hunt, 749 F.2d 1457, 1464 (10th Cir. 1984). If the agency determines that its proposed action will not significantly affect the environment, it may issue a FONSI. Id.

The initial determination concerning the need for an EIS lies with the agency. Id. at 1468. The reviewing court's role is to determine whether the "agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." Id. at 1465-66 (citing Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc., 462 U.S. 87 (1983)).

-7-

**I. Whether the EA adequately addresses cumulative impacts.**

Airport Neighbors argues that the EA impermissibly ignores the cumulative impacts associated with the Runway 3-21 upgrade. Airport Neighbors claims that the proposed action is a single component in a larger contemplated expansion at the Airport, as evidenced by the Master Plan. Therefore, Airport Neighbors believes that the EA should have addressed the environmental impacts of several projects proposed in the Master Plan such as expansion of the passenger terminal, construction of a second parking structure, construction of a new cargo terminal, and expansion of surface access roads.[2] The FAA and City respond that the Runway 3-21 project has independent utility from other components of the Master Plan, which at this time are merely elements of a plan that might be completed over a 20-year period. The Respondents state that the FAA will follow NEPA procedures for each component of the Master Plan when the City actually proposes to construct the particular component.

In determining whether a proposed action will significantly affect the environment and therefore trigger an EIS, the agency must consider:

> [w]hether the action is related to other actions with individually insignificant but <u>cumulatively significant impacts</u>. Significance exists if it

---

[2] The EA does address the environmental effects of closing Runway 17-35 as the City plans to close this runway following the completion of the Runway 3-21 upgrade. Airport Neighbors does not argue that the EA's analysis of the Runway 17-35 closure is inadequate.

is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

40 C.F.R. § 1508.27(b)(7) (emphasis added). In turn, the Council on Environmental Quality ("CEQ") regulations define a cumulative impact as:

the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions.... Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7 (emphasis added). Therefore, in determining whether the Runway 3-21 upgrade will significantly affect the environment, the FAA must consider the impact of reasonably foreseeable future actions.

In Park County Resource Council, Inc. v. United States Dep't of Agric., 817 F.2d 609 (10th Cir. 1987), we expressed the test for whether particular actions could be considered cumulative impacts of the proposed action as whether the actions were "so interdependent that it would be unwise or irrational to complete one without the others." 817 F.2d at 623 quoting (Webb v. Gorsuch, 699 F.2d 157, 161 (4th Cir. 1983)). See also Sierra Club v. Froehlke, 534 F.2d 1289, 1297-98 (8th Cir. 1976); Trout Unlimited v. Morton, 509 F.2d 1276, 1285 (9th Cir. 1974). In Park County, petitioners challenged the Forest Service's issuance of a federal oil and gas lease to a petroleum company. 817 F.2d at 612. The Forest Service had issued a FONSI for the agency's program of issuing such leases in the Rocky Mountain region after conducting an EA, but noted that prior to any

-9-

drilling activity, the need for a site-specific and more comprehensive EIS would be examined. Id. Park County argued that an EIS was required at the time the agency issued a lease to the petroleum company because of eventual cumulative and foreseeable effects of exploratory drilling and full field development. Id. at 622. However, because we considered development on the leased lands to be "an extremely tentative possibility," we held that the possibility of exploratory drilling and full-field development were not cumulative effects of granting an oil and gas lease:

> the steps from leasing to full field development are not so interdependent that it would be unwise or irrational to complete one without the others--the benchmark signaling the need for a cumulative impact EIS. To require a cumulative EIS contemplating full field development at the leasing stage would thus result in a gross misallocation of resources....

Id. at 623 (citations omitted).[3]

Airport Neighbors argues that the present case is closer to Citizens for Responsible Area Growth v. Adams, 477 F. Supp. 994 (D. N.H. 1979), where the

---

[3] We noted, however, that as an overall regional pattern or plan evolves, the region-wide ramifications of development will need to be considered at some point:

> A singular, site-specific [application to drill], one in a line that prior to that time did not prompt such a broad-based evaluation, will trigger that necessary inquiry as plans solidify. We merely hold that, in this case, developmental plans were not concrete enough at the leasing stage to require such an inquiry.

817 F.2d at 623.

City of Lebanon employed the assistance of three federal agencies to expand its airport and an adjacent industrial park, none of which decided an EIS was necessary for the particular projects they each sponsored. Id. at 997. The City of Lebanon argued that the three projects were independent, but the plaintiffs characterized the three projects as a comprehensive air terminal-industrial park development program that ultimately would expand the industrial park from 50 to 260 acres. Id. However, each of the various components of the airport expansion and development of the adjacent industrial park either were actually underway or were in the design and bidding stage, and the federal agencies had consistently considered each of the components as part of a single project. Id. at 997, 1001-02. On these facts, the court noted that the decision of whether to prepare an EIS requires that "the agencies look not only to the full scope of the present project, but also to the overall cumulative effect of the ultimate project." Id. at 1003. Recognizing that the "responsibility to perform a comprehensive initial assessment of environmental impact under NEPA is not diminished by a limited project definition," the court ordered the FAA to prepare an EIS for the entire development project. Id. at 1001, 1005. See also Save the Yaak Comm. v. Block, 840 F.2d 714, 720-21 (9th Cir. 1988) (requiring the Forest Service to consider impact of increased timber harvesting that would foreseeably result from the

proposed reconstruction of a road when an "inextricable nexus" existed between the road reconstruction and the logging operations).

However, we consider Adams and Save the Yaak readily distinguishable from the present case. Here, no "inextricable nexus" exists between the Runway 3-21 upgrade and other components of the Master Plan. Although the Runway 3-21 upgrade and the other components currently might be linked, the City clearly could sever this link by deciding to abandon the Master Plan without destroying the proposed action's functionality; the upgrade still would serve the purpose of accommodating the influx of passengers anticipated to occur during the upcoming decades at the state's only commercial jet passenger airport.[4] And unlike in Adams, where the agencies "themselves once treated the proposed and completed construction at Lebanon Airport as one project," see 477 F. Supp. at 1002, and where the City of Lebanon had publicly discussed the projects as being interdependent, see id. at 1001 n.13, the record suggests that the FAA and the City would upgrade Runway 3-21 even if the other components of the Master Plan never get off the ground.

Therefore, applying the Park County test, we agree with Respondents that the remaining components of the Master Plan are not so interdependent that it

---

[4] The EA states that the Airport enplaned 2,461,434 passengers in 1991 and forecasts that 5,900,000 passengers will enplane annually by 2015.

would be unwise or irrational to complete the Runway 3-21 upgrade without them.  We recognize that one of the asserted purposes of the Runway 3-21 upgrade is to accommodate air traffic while another component of the Master Plan--reconstruction of the 8-26 Runway--is proceeding.  However, the alternate purpose of the Runway 3-21 upgrade--to accommodate the inevitable increased passenger traffic flying in and out of the Airport--possesses a justification independent from other components of the Master Plan.  Upgrading Runway 3-21 does not necessarily signal a commitment to proceed with the rest of the Master Plan.  Accordingly, we do not believe that the FAA inappropriately ignored cumulative impacts when it failed to analyze extensively the remaining components of the Master Plan in the EA.  As in Park County, requiring a cumulative EIS analyzing possible future actions postulated in a twenty-year Master Plan that are far from certain would result in "a gross misallocation of resources, would trivialize NEPA and would diminish its utility in providing useful environmental analysis for major federal actions that truly affect the environment."  817 F.2d at 623 (quotations omitted).[5]

---

[5]  Airport Neighbors suggests that the various elements of the Master Plan also can be considered "connected actions" because they are projects that "cannot or will not proceed unless other actions are taken previously or simultaneously" and constitute "interdependent parts of a larger action and depend on the larger actions for their justification."  See 40 C.F.R. § 1508.25(a)(1).  Assuming, without deciding, that this definitional section applies to EA obligations, we conclude that the record does not show that any elements of the Master Plan
(continued...)

## II. Whether the EA considers a reasonable range of alternatives.

Airport Neighbors argues that the EA fails to discuss reasonable alternatives to the Runway 3-21 expansion as required by NEPA and implementing regulations. See 40 C.F.R. § 1508.9(b) (requiring the EA to consider the "environmental impacts of the proposed action and alternatives"). Airport Neighbors states that the FAA evaluated only one alternative--the no action alternative--while summarily rejecting several other reasonable alternatives, including: (1) the construction of a second east-west runway parallel to Runway 8-26; and (2) the development of a new airport. In deciding whether the FAA acted arbitrarily by not considering certain alternatives, we remain mindful that an agency decision concerning which alternatives to consider is necessarily bound by a "rule of reason and practicality." Committee to Preserve Boomer Lake Park v. DOT, 4 F.3d 1543, 1551 (10th Cir. 1993); Environmental Defense Fund, Inc. v. Andrus, 619 F.2d 1368, 1375 (10th Cir. 1980).

Here, we do not believe the FAA acted arbitrarily by not considering either alternative because implementing either alternative would be infeasible. In reviewing whether an agency should have considered a particular alternative, we have held that "[a]n agency need not analyze the environmental consequences of

---

[5](...continued)
necessarily are connected to the Runway 3-21 expansion under Section 1508.25(a)(1).

alternatives it has in good faith rejected as too remote, speculative, or as in this case, impractical or ineffective." City of Aurora v. Hunt, 749 F.2d 1457, 1467 (10th Cir. 1984) (upholding FAA's rejection of alternative when FAA considered alternative infeasible due to precipitous terrain, high-rise complexes, and dense development). See also Holy Cross Wilderness Fund v. Madigan, 960 F.2d 1515, 1528 (10th Cir. 1992) (upholding agency's rejection of alternative on grounds that agency considered alternative too speculative and dependent on many uncertainties). Regarding the parallel runway alternative, the EA concluded that a parallel runway could not be built more than 3,400 feet away from the existing runway because of rapidly falling terrain to the south, east, and west,[6] and because of developed urban use to the north. The EA also rejected a parallel runway closer to the primary runway as infeasible because this alternative would require the removal of two major Air Force weapons laboratories and storage facilities. Similarly, regarding the new airport alternative, the EA sets forth numerous reasons why constructing a new airport would be infeasible. Planners would have to build new facilities and a new infrastructure, extend utilities and

---

   [6] The Airport is located on the edge of a mesa. As a result, a runway placed 3,400 feet away from the existing runway--the minimum distance between runways which permits simultaneous operations on parallel runways--would be located off the edge of the mesa and require as much as 150 feet of fill over seventy to eighty percent of the runway length. The EA considered this alternative as "virtually impossible" to implement.

-15-

freeways, possibly relocate the adjoining Air Force facilities, and address numerous environmental complications to presently undeveloped land. The EA estimates that a new airport could cost several billion dollars. Considering these problems with a parallel runway and a new airport, we do not find the FAA's decision that implementing either proposed alternative would be infeasible to be arbitrary.

### III. Whether the EA adequately addresses direct and indirect effects.

Airport Neighbors next argues that in the EA the FAA ignored safety concerns surrounding the construction on Runway 3-21 and the additional noise that will be generated by aircraft using new air traffic patterns during reconstruction of Runway 8-26.[7] Because construction of Runway 3-21 has been

---

[7] Airport Neighbors' evidence of the effects the Runway 3-21 upgrade will have on noise and safety arises solely from an affidavit (the "Lintzenich affidavit") that is not part of the agency record because it was not presented to the FAA while the agency was drafting the EA, but rather was introduced for the first time as part of the present legal proceedings. The parties accordingly dispute whether this Court can consider on appeal the allegations made in the Lintzenich affidavit. Normally, challengers to a proposed action must make their record before the agency and courts will not consider any new evidence on appeal. See New Mexico Env. Imp. Div. v. Thomas, 789 F.2d 825, 834 (10th Cir. 1986). Airport Neighbors argues that a court can consider evidence outside the record when necessary to establish that the agency ignored relevant factors in making its decision. See American Mining Congress v. Thomas, 772 F.2d 617, 626 (10th Cir. 1985), cert. denied, 476 U.S. 1158 (1986). However, as we conclude below, we do not believe that the agency ignored any relevant factors in issuing the FONSI, and thus we decline to consider the factual allegations contained in the Lintzenich affidavit.

completed, we consider Airport Neighbors' concern over safety during construction to be moot. Furthermore, because the reconstruction of Runway 8-26 is not part of the proposed action, the FAA was not required to address in the present EA the impact this construction will have on noise in the area surrounding the Airport. Airport Neighbors argues that the FAA was required to consider the noise impact from the Runway 8-26 reconstruction as a direct or indirect effect of the Runway 3-21 expansion. See 40 C.F.R. § 1508.8 (including direct and indirect effects as effects that must be considered when reviewing environmental effects). However, Section 1508.8 defines direct or indirect effects as "effects, which are caused by the [proposed] action...." Id. The EA states that reconstruction of Runway 8-26 is required within the next five to seven years, and will proceed regardless of whether Runway 3-21 is upgraded. Therefore, we find no basis to conclude that the expansion of Runway 3-21 is the cause of the reconstruction of Runway 8-26. Rather, It is the deteriorating condition of Runway 8-26 which is creating the need for reconstruction; the upgrade of Runway 3-21 merely is facilitating airport operations while Runway 8-26 is under reconstruction.[8]

---

[8] In its briefs, Airport Neighbors raised a fourth argument that the EA relied on inflated capacity requirements to justify the Runway 3-21 upgrading because the predicted volume assumed the installation of an Instrument Landing System ("ILS") on Runway 3-21--a project which Airport Neighbors claimed had never been authorized or funded. However, the FAA since has installed such an ILS

(continued...)

**Conclusion**

For the reasons stated above, we conclude that Respondents did not ignore any cumulative impacts of the Runway 3-21 upgrade in the EA because the upgrade of the runway is not so interdependent with the other components of the Master Plan that it would be unwise or irrational to upgrade the runway without implementing the Plan's other elements. We also believe that the Respondents acted reasonably in excluding analysis of the parallel runway and new airport alternatives from the EA. Finally, we believe the Respondents did not inappropriately ignore noise and safety issues in the EA. We therefore AFFIRM the FAA decision to issue a FONSI and not draft an EIS.

---

[8](...continued)
system on Runway 3-21. Accordingly, Airport Neighbors conceded at oral argument that this issue is moot.