**F I L E D**

**PUBLISH**

**February 24, 2006**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UTAH ENVIRONMENTAL
CONGRESS,

       Plaintiff-Appellant,

v.

DALE BOSWORTH, as Chief of the
Forest Service; UNITED STATES
FOREST SERVICE; MARY
ERICKSON, as Supervisor of the
Fishlake National Forest; MARVIN
TURNER, Loa District Ranger,

       Defendants-Appellees.

No. 03-4251

---

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 02:02-CV-00321 PGC)**

---

Stephen H. Novack, (Ray Vaughan, Wildlaw, Montgomery, Alabama, with him on
the briefs), Wildlaw Southern Appalachian Office, Asheville, North Carolina, for
Plaintiff-Appellant.

Mark K. Haag (Thomas Sansonetti, Assistant Attorney General; and David C.
Shilton and Myesha K. Braden, Environment & Natural Resources Division,
Department of Justice, Washington, D.C., with him on the brief), Environment &
Natural Resources Division, Department of Justice, Washington, D.C., for
Defendants-Appellees.

Before **EBEL** and **HENRY,** Circuit Judges, and **WHITE**, District Judge.[*]

**HENRY**, Circuit Judge.

## ORDER ON PETITION FOR REHEARING

This matter is before the court on Appellees' petition for rehearing. The panel has voted to grant a limited rehearing to modify some of the language in our panel opinion. The court's opinion filed on August 19, 2005 is withdrawn, and an amended opinion is attached to this order.

## OPINION

In October 2001, the Forest Service approved a timber-harvesting project in Utah's Fishlake National Forest. Utah Environmental Congress ("UEC"), an environmental organization, filed a petition for review, and the district court dismissed the petition and affirmed the project's authorization. UEC alleges on appeal that the Forest Service (1) did not properly select and monitor the Management Indicator Species ("MIS") that it used to determine the effects of management activities on other species, and (2) did not consider a reasonable

---

[*]The Honorable Ronald A. White, United States District Judge for the Eastern District of Oklahoma, sitting by designation.

range of alternatives to the project. Exercising jurisdiction under 28 U.S.C. § 1291, we reverse the judgment below and remand to the district court with instructions to vacate the Forest Service's approval of the project. After the district court rendered its decision, our court decided *Utah Environmental Congress v. Bosworth*, 372 F.3d 1219 (10th Cir. 2004) ("*UEC I*"). This intervening circuit precedent required the agency to collect quantitative population data on actual MIS populations before authorizing a project under the 1982 planning regulations, which the Forest Service used here.

## I. BACKGROUND

The Thousand Lakes Community Forestry Initiative Project ("the Project") is located in Wayne County, Utah, on the 1.5-million-acre Fishlake National Forest. A collaboration of timber representatives, environmentalists, politicians, and federal land managers undertook the Project (1) "to reduce the overall stand densities of the [spruce and aspen] stands that are at the highest risk of [spruce beetle] infestation, while maintaining a forested appearance" and (2) "to provide forest products to resource dependent industries in an economically feasible manner." Administrative Record vol. I, at ("1 AR") 000044. The Project encompasses timber harvests on 219 acres, with approximately one-half mile of road re-construction and post-treatment activities to minimize erosion and the use

3

of authorized vehicles.  No new road building is involved.  The Project would use salvage (removal of unhealthy trees), sanitation (removal of dead trees in excess of resource needs for habitat), and commercial thinning (removal to reduce overall stand densities).

The Forest Service manages the Fishlake National Forest at two different levels.  "At the first level, the Forest Service develops the Forest Plan, [which is] a broad, programmatic document, accompanied by an Environmental Impact Statement and public review process conducted in accordance with the National Environmental Policy Act ['NEPA']."  *Colorado Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1167-68 (10th Cir. 1999); 16 U.S.C. § 1604.  To this end, the Forest Service adopted the Fishlake National Forest Plan (the "Forest Plan") in 1986 to maintain the Fishlake National Forest.  As part of its substantive responsibilities, the Forest Plan must "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives."  16 U.S.C. § 1604(g)(3)(B).

At the second level, "the Forest Service implements the Forest Plan by approving (with or without modification) or disapproving particular projects," such as the Thousand Lakes Community Forestry Initiative Project.  *Dombeck*, 185 F.3d at 1168.  Individual projects are also subject to NEPA and must comply with the Forest Plan and the National Forest Management Act ("NFMA").  16

4

U.S.C. § 1604(i).

In November 1999, the Forest Service began preparing an Environmental Assessment ("EA") of the Project. The Forest Service examined the Project's potential impact to wildlife, soils, vegetation, and other resources, and it prepared a Biological Assessment and Biological Evaluation of impacts to sensitive plant and animal species. In May 2001, the Forest Service published its EA for the Project, and in October 2001, the district ranger issued a finding of no significant impact ("FONSI") and a Decision Notice approving the Project. UEC brought an administrative appeal, and the Forest Service issued a Final Decision in February 2002 that affirmed the district ranger. 1 AR 000032.

UEC challenged the Forest Service's approval of the Project in federal district court. In September 2003, the district court dismissed UEC's petition for review and affirmed the agency's Decision Notice and FONSI. UEC now appeals the Forest Service's approval of the Project on two of the three grounds rejected by the district court. UEC alleges that the Forest Service (1) did not properly select and monitor certain Management Indicator Species and (2) did not consider a reasonable range of management alternatives.[1]

_____

[1]UEC also argued, before the district court and in its appellate briefs, that the Forest Service improperly revalidated (i.e., redrew) boundaries for inventoried roadless areas. At oral argument, UEC waived this third argument. While we understand that litigants often refine legal strategies up to oral argument, we

(continued...)

5

## II. STANDARD OF REVIEW

We take "an independent review of the agency's action" and are not bound by the district court's factual findings or legal conclusions. *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1569 n.16, 1577 n.27 (10th Cir. 1994). We review the Forest Service's decision under the Administrative Procedures Act and set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). We give deference to an agency's interpretation, "especially when that interpretation involves questions of scientific methodology." *Dombeck*, 185 F.3d at 1170. In addition, "[t]he agency, not the reviewing court, is entrusted with the responsibility of considering the various modes of scientific evaluation and theory and choosing the one appropriate for the given circumstances." *City of Bridgeton v. FAA*, 212 F.3d 448, 459 (8th Cir. 2000) (quotation marks and internal citation omitted), *cited with approval in Custer County Action Ass'n v. Garvey*, 256 F.3d 1024, 1036 (10th Cir. 2001). "[T]he court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park v. Volpe*,

---

[1](...continued)
nonetheless encourage prompt notice to the court about waived claims. UEC could have filed a motion to withdraw the revalidation issue, pursuant to FED. R. APP. P. 27. Such notice assists the court by obviating our need to prepare issues later found to be abandoned, and allows us to utilize limited judicial resources effectively.

401 U.S. 402, 416 (1971).

## III.  APPLICABLE FOREST SERVICE REGULATIONS

Before we proceed to UEC's separate challenges, we briefly describe the relevant regulations at issue.  Forest Service regulations implement NFMA's requirement that the government address how forest plans provide for plant and animal diversity.  Rules enacted in 1982 required the Forest Service to identify and select MIS "to estimate the effects of each [management] alternative on fish and wildlife populations."  36 C.F.R. § 219.19(a)(1) (1999).  The Department of Agriculture ("Department") substantially amended the 1982 regulations in November 2000, *see* 65 Fed. Reg. 67,568 (Nov. 9, 2000), and followed those somewhat confusing amendments with a bewildering series of transitional rules.  First, the 2000 regulations included a transition provision that initially delayed the application of its substantive provisions to project decisions until November 2003.  *See* 36 C.F.R. § 219.35(d) (2001).  The Department subsequently proposed revisions to the 2000 regulations and further extended the transition period for applying the substantive provisions to project decisions.  *See id.* (2004); 68 Fed. Reg. 53,294 (Sept. 10, 2003); 67 Fed. Reg. 72,770 (Dec. 6, 2002).  New rules replaced the 2000 planning regulations in January 2005.  70 Fed. Reg. 1023 (Jan. 5, 2005).  The 2005 rules include yet another transition provision with directions

7

for the application of MIS. 36 C.F.R. § 219.14(f) (2005); 70 Fed. Reg. at 1048, 1052; *see generally Silverton Snowmobile Club v. United States Forest Serv.*, 433 F. 3d 772, 785 n.4 (10th Cir. 2006) (describing how "[t]he regulations which implement the NFMA have been frequently amended").

Under the transition provisions, from November 9, 2000, until the promulgation of final planning regulations, the Forest Service was directed to "consider the best available science in implementing" a forest plan. 36 C.F.R. § 219.35(a), (d) (2004). When the Forest Service issued its Decision Notice in October 2001 and filed its appellate brief in this court in May 2004, it did not contend that the transition provisions of the 2000 regulations applied to the Project. The Forest Service only considered authorization of the Project under the "1982 rule," those regulations in place prior to the 2000 amendments. *See* 36 C.F.R. § 219.19 (1999).

In a Rule 28(j) letter filed one week before oral argument, the Forest Service informed us of the Department's publication of an interpretative rule in September 2004. 69 Fed. Reg. 58,055 (Sept. 29, 2004); *see also* FED. R. APP. P. 28(j). The interpretative rule explained that the 2000 regulations rendered the 1982 rule inoperative for project-specific decisions made after November 9, 2000. The interpretative rule stated that, during the transition period between November 2000 and promulgation of a final rule, the Forest Service should use the "best

8

available science" under § 219.35(a) for project decisions. 69 Fed. Reg. at 58,056.

Significantly, and thankfully, the Forest Service now concedes on appeal that it has waived any argument that the 2000 regulations apply. *See* Aples' Pet. for Panel Reh'g at 6-7 ("Because we did not raise the issue of the 2000 rule until we filed our 28(j) letter, this Court may reasonably conclude that the government has in this case waived any argument that the 2000 rule applies."). We appreciate the candor of the agency's concession in light of its oral arguments and briefing–both on appeal and in the district–under the 1982 rule. Indeed, as the Second Circuit has noted, "the standards of the 1982 Rules and the 2000 Transitional Rule are–at least–distinct." *Forest Watch v. United States Forest Serv.*, 410 F.3d 115, 117 (2d Cir. 2005). Like the Second Circuit's case, "nothing in the record explains what 'best available science' entails." *Id.*; *see also id.* ("declin[ing] to decide whether work done by the agency under one regime satisfies the demands of another").

Thus, we review the Forest Service's obligations under the 1982 rule, and Code of Federal Regulations citations used in this opinion (unless otherwise noted) refer to the 1999 edition, which is the last published edition before the 2000 amendments.

9

# IV. ANALYSIS

UEC claims that the Forest Service acted arbitrarily, capriciously, and contrary to law by (1) failing to select and monitor Management Indicator Species appropriately and (2) failing to consider a reasonable range of project alternatives.

A.  Selection and monitoring of MIS under 36 C.F.R. § 219.19

To assess habitat viability, the Forest Service estimates a project's effect on certain representative species.

> Fish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area.
>
> . . . .
>
> (a)(1)  In order to estimate the effects of each [management] alternative on fish and wildlife populations, certain vertebrate and/or invertebrate species present in the area shall be identified and selected as management indicator species and the reasons for their selection will be stated.  Those species shall be selected because their population changes are believed to indicate the effects of management activities.

36 C.F.R. § 219.19.  "[A]rea" in subsection (a)(1) refers to a "planning area," a term mentioned several times in § 219.19.  *See id.* § 219.3 (defining "planning area" as "[t]he area of the National Forest System covered by a regional guide or forest plan").

MIS are analogous to the famed canaries once used to monitor air in coal mines.  They are a "bellwether" "for other species that have the same special

10

habitat needs or population characteristics," *Inland Empire Pub. Lands Council v. Schultz*, 88 F.3d 754, 762 n.11 (9th Cir. 1993), and serve as "a proxy for determining the effects of management activities on other species." *Forest Guardians v. United States Forest Serv.*, 180 F. Supp. 2d 1273, 1281 (D.N.M. 2001). The regulations require that "[p]opulation trends of the management indicator species will be monitored and relationships to habitat changes determined." 36 C.F.R. § 219.19(a)(6). In addition, "[i]nventories shall include quantitative data making possible the evaluation of diversity in terms of its prior and present conditions." *Id.* § 219.26.

To meet the diversity provisions under § 219.19, the Forest Plan designates two categories of MIS: "ecological indicator" and "high interest" species. The ecological indicators include five groups of species and one individual species: the sage-nester guild, riparian guild, cavity-nester guild, resident trout, macro-invertebrates, and northern goshawk. A "guild" is a group of species that exploits the same class of environmental resources in the same way. The Forest Service selects ecological indicator species according to five criteria: (1) "affinity for the vegetation type," (2) "life cycle keyed to a vegetation type," (3) "[s]ensitivity to habitat change," (4) "[r]elative ease of monitoring, i.e., easily recognized and adequate numbers," and (5) being "[s]omewhat representative of other species which use the same vegetation type." 1 AR 000157 (Forest Plan's Final

11

Environmental Impact Statement ("FEIS") at III-34).

"High interest" MIS include elk, mule deer, Bonneville cutthroat trout, and Rydberg's milkvetch. The Forest Service chose "high interest" MIS "because of their threatened, endangered, or sensitive status, social or economic importance, or high public interest." *Id.* at III-36. UEC does not challenge, and we need not examine, the Forest Service's selection of "ecological indicator" and "high interest" MIS guilds for the Project. Rather, UEC challenges the chosen representatives within these MIS guilds.

Our recent decision in *UEC I* addressed the Forest Service's MIS obligations with regard to the Monroe Project, another project in the Fishlake National Forest, and that decision resolves two important issues here. First, *UEC I* makes clear that "the regulations anticipate application of § 219.19 to project level as well as plan level management actions." 372 F.3d at 1225. As we noted in *UEC I*, this approach is consistent with other circuits. *See Sierra Club v. Martin*, 168 F.3d 1, 6 (11th Cir. 1999) (recognizing "that the regulations refer to the formulation of Forest Plans rather than to specific projects proposed under already enacted Forest Plan" but that "the planning process does not end with the Forest Service's approval" and "continue[s] throughout the Plan's existence"); *Inland Empire Pub. Lands Council*, 88 F.3d at 760 n.6 ("Because any district contained within the boundaries of a forest having a plan would be an 'area . . .

12

covered by a . . . forest plan,' it would . . . also be a planning area governed by Regulation 219.19.") (quoting 36 C.F.R. § 219.3). Thus, the Forest Service's obligations under § 219.19 apply to the Project.

Second, we decided in *UEC I* that the Forest Service must use "actual, quantitative population data" to meet MIS monitoring obligations under § 219.19. 372 F.3d at 1226. "[T]o effectuate its MIS monitoring duties under the language of its regulations, the Forest Service must gather quantitative data on actual MIS populations that allows it to estimate the effects of any forest management activities on the animal population trends, and determine the relationship between management activities and population trend changes." *Id.* at 1227; *see also Martin*, 168 F.3d at 6 (examining § 219.19(a)(6) and concluding that "[i]t is implicit that population data must be collected before it can be monitored and its relationship determined"). Prior to *UEC I*, the Forest Service contended that it need not conduct "head-counts" of MIS in a planning area because it had discretion to assess a project's effects on MIS using habitat data, population data, or both. *See generally* Andrew Orlemann, Note, *Do the Proposed Forest Service Regulations Protect Biodiversity? An Analysis of the Continuing Viability of "Habitat Viability Analysis,"* 20 J. LAND RESOURCES & ENVTL. L. 357, 360-374 (2000) (describing the split among federal circuits as to the adequacy of habitat viability analysis under § 219.19).

13

With these requirements in mind, we examine UEC's challenges to the Forest Service's monitoring of the (1) sage-nester guild, (2) riparian guild, (3) cavity-nester guild, (4) northern goshawk, and (5) Mexican spotted owl.

1.    *Sage-nester guild: sage grouse as MIS*

UEC maintains that the Forest Service (1) did not determine the presence of sage nesters in the Project area and (2) did not explain why it chose the sage grouse as the guild's sole representative.  The Forest Service concluded, based on a July 2000 field survey and unpublished radio telemetry data, that sage grouse are not present in the Project area.  1 AR 000079; 2 AR 000773, 001247.  It also used aerial photos and vegetation mapping to conclude that the Project includes no sagebrush habitat.  The EA noted that the Project's road reconstruction would occur along an existing road through "potential sage nesting habitat."  1 AR 000079.  However, "because sage nesters have not been documented along the road and the additional disturbance would involve only .01% or less of total available sagebrush habitat on Thousand Lakes Mountain, [effects] to sage nesting species [are] expected to be minimal as a result of implementing the Proposed Action."  *Id.*

We first look to our treatment of the Forest Service's sage grouse monitoring in *UEC I*, as the same Forest Plan and regulations governed the agency's responsibilities for that project.  In *UEC I*, the Forest Service

14

acknowledged that sage grouse were "potentially present" and referenced "unconfirmed sightings" in the Monroe project area. 372 F.3d at 1229. We also recognized "that the MIS selected for the plan were chosen, in part, due to relative ease of monitoring." *Id.* (internal quotation marks and brackets omitted). While "not all MIS designated in the Fishlake Forest Plan are necessarily present within [a project] area," the Forest Service must show "good faith efforts to confirm the absence or presence of an MIS species" under § 219.19. *Id.* at 1229-30 (internal citation and quotation marks omitted). In *UEC I*, "the record reflect[ed] no attempt by the Forest Service to confirm the presence" of the sage grouse, and we therefore concluded that the agency did not comply with § 219.19. *Id.* at 1230.

The Thousand Lakes Project on this appeal is governed by the same Forest Plan as in *UEC I*, and the Forest Service similarly selected the sage grouse in part due to its "[r]elative ease of monitoring." 1 AR 000157 (FEIS at III-34). The agency provides no evidence of any sage grouse population or even a single sighting in the Project area. Importantly, however, UEC does not contest the Forest Service's finding of virtually no sagebrush habitat within the Project area. Based on the Forest Service's field survey, aerial photos, and vegetation mapping, we conclude that the agency has demonstrated good-faith efforts to confirm the absence of the MIS guild representative from the Project area. Accordingly, the

15

Forest Service need not collect population data of the sage-nester guild for this project. *See UEC I*, 372 F.3d at 1230 ("[W]e do not require the Forest Service to attempt to track a species where no population exists.") (internal quotation marks omitted).

2.     *Riparian guild: Southwestern willow flycatcher as MIS*

Similar to its contentions regarding the sage grouse are UEC's arguments that the Forest Service (1) has not collected quantitative population data on the Southwestern willow flycatcher and (2) has not adequately explained why it chose this MIS representative for the riparian guild. The Southwestern willow flycatcher is an endangered species. Under the Forest Plan, the agency is responsible for annual visual reconnaissance and reporting for endangered species. *See* 1 AR 000157 (Forest Plan at V-6).

According to the EA, willow flycatchers were observed in the 1990s in thick willow stands eight air miles northwest of the Project area. 1 AR 000069; *see also* 2 AR 000768 (Project's Biologist Report). However, the EA concluded that no potential habitat occurs in the Project area because, "[b]ased on field surveys, no willow flycatchers had been documented on the Thousand Lakes Mountain." 1 AR 000069. The Forest Service references formal flycatcher surveys in the Fishlake National Forest, including areas of the Loa Ranger District, conducted since 1994. 2 AR 001336. However, we cannot assess these

16

field surveys because they are not in the administrative record before us. *See UEC I*, 372 F.3d at 1227 (instructing courts to examine the Forest Service's approval of a project "based on the administrative record").

Given the absence of quantitative data in the record and the agency's failure to satisfy the Forest Plan's monitoring requirements for an endangered species, we come to the same conclusion as we did in *UEC I* for this species: "While annual monitoring of the southwestern willow flycatcher's presence, abundance, and nesting is sufficient to meet the Forest Service's obligations under the Fishlake Forest Plan and § 219.19, because we find no such data in the record, we are unable to conclude that the Forest Service fulfilled its obligations under § 219.19 in monitoring this MIS." *Id.* at 1229.

3. *Cavity-nester guild: three-toed woodpecker and flamulated owl as MIS*

The Forest Service selected two species, the three-toed woodpecker and the flamulated owl, to represent the cavity-nester guild. The three-toed woodpecker lives in spruce and aspen habitat and relies on spruce beetles as a primary food source; its population fluctuates with prey abundance. 1 AR 000073; 2 AR 001250. The flamulated owl also feeds on spruce beetles. The Project's primary objective is to reduce "the overall stand densities of the stands that are at the highest risk of infestation" of spruce bark beetles. 1 AR 000044.

17

Visual and auditory surveys detected woodpeckers on Thousand Lakes Mountain during 2000, but nesting pairs were not located. *Id.* at 000151. The EA concluded that "the proposed treatment acres represent approximately 2% of the total available spruce/aspen habitat for the three-toed woodpecker on Thousand Lakes Mountain. Direct and indirect effects to the three-toed woodpecker are therefore not expected to cause a loss of population viability . . . ." *Id.* at 000075. We also acknowledge the Forest Service's pronouncement of "stable trends" in the populations of eighteen cavity nesters, including the three-toed woodpecker, based on a breeding bird survey in Wayne County. 2 AR 001348. However, we do not find sufficient quantitative data on the three-toed woodpecker in the administrative record to determine population trends or to forecast the Project's effects on its population viability. Accordingly, the Forest Service has not met its MIS monitoring responsibilities under § 219.19 with respect to the three-toed woodpecker.

As to flamulated owls, the Forest Service cites a 1991 study and 1992 study that detected the owls in mixed conifers one mile west and 2.5 miles east of the Project area. 1 AR 000075. The EA recognized that the Project's proposed salvage harvest would remove potential nesting habitat for the owl, and concedes "[w]hether these owls would tolerate selective logging during the breeding season near a nest site is unknown." *Id.* at 000076. The Forest Service contends that the

18

Project's impact on the owl will be minimal because (1) the Project area's vegetation is not the owl's preferred habitat and (2) the Project area constitutes only a small percentage of available habitat on Thousand Lakes Mountain. However, in light of the paucity and staleness of quantitative data on the flamulated owl in the record, the Forest Service has not satisfied its obligations under § 219.19 for this species.

4.      *Northern goshawk as MIS*

UEC next maintains that the Forest Service did not satisfy its MIS monitoring for the northern goshawk. The Forest Service collected monitoring data through (1) four aerial surveys of the Project area in 2000, (2) ground surveys in 2000 and 2001, and (3) additional surveys and a statewide habitat assessment conducted between 1998 and 2000. 2 AR 001234-45, 001279, 001364-65, 001369. *UEC I* relied in part on the same population data when concluding that the Forest Service's actions were adequate. 372 F.3d at 1227-28. We agree with *UEC I* that, based on the administrative record, the Forest Service fulfilled its § 219.19 MIS monitoring with respect to the northern goshawk.

5.      *Threatened and endangered species: Mexican spotted owl*

UEC finally contends that the Forest Service did not properly monitor the

19

Mexican spotted owl, a threatened and endangered species.[2]  The Forest Plan

mandates that the Forest Service annually monitor by visual reconnaissance any

threatened, endangered, and sensitive animals in the Fishlake National Forest to

ensure "no decrease attributed to management activities." 1 AR 000157 (Forest

Plan at V-6).

The Forest Service conducted a Thousand Lakes Mountain survey for the

Mexican spotted owl between 1991 and 1994, and no breeding pairs were

documented at that time.  *Id.* at 000070.  Surveyors detected a single female in

June and July 1991.  Because only single birds were detected, the Forest Service

concluded that "incidental use by non-breeding individuals was occurring." *Id.*

Due to the "incidental use," the EA reported that "[e]ffects to the Mexican spotted

owl as a result of the Proposed Action [are] expected to be minimal." *Id.* at

000071.  However, without more regular and complete quantitative data to

monitor population trends, the Forest Service has not satisfied the monitoring

provisions of the Forest Plan with respect to the Mexican spotted owl. *See* 16

U.S.C. § 1604(i).

---

[2]UEC also vaguely asserts in its opening brief that the Forest Service did
not adequately collect population data to monitor the Utah prairie dog, bald eagle,
and peregrine falcon.  An issue mentioned in a brief on appeal, but not addressed,
is waived. *See Ambus v. Granite Bd. of Educ.*, 975 F.2d 1555, 1558 n.1 (10th Cir.
1992), *modified on other grounds on reh'g*, 995 F.2d 992 (10th Cir. 1993).

6.    *Conclusion*

Accordingly, the Forest Service has not met its obligations under § 219.19 for the riparian guild and cavity-nester guild, and the agency has not complied with the Forest Plan as to the Mexican spotted owl.

B.    Consideration of NEPA alternatives

UEC next contends that the Forest Service acted arbitrarily when the Project's EA formally considered only two alternatives: a no-action alternative and the modified proposed action.  Under NEPA, federal agencies prepare an EIS when they propose a "major Federal action[] significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(c).  "Agencies need not prepare a full EIS, however, if they initially prepare the less detailed [EA] and, based on the EA, issue a [FONSI], concluding that the proposed action will not significantly affect the environment."  *Pennaco Energy, Inc. v. Dep't of Interior*, 377 F.3d 1147, 1150 (10th Cir. 2004) (internal quotation marks omitted); *see also* 40 C.F.R. §§ 1501.4, 1508.9.  "A properly drafted EA must include a discussion of appropriate alternatives to the proposed project."  *Davis v. Mineta*, 302 F.3d 1104, 1120 (10th Cir. 2002).

We review the Forest Service's actions only to "insure that the agency has taken a 'hard look' at environmental consequences."  *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n.21 (1976).  "In deciding whether the [agency] acted arbitrarily by

21

not considering certain alternatives, we remain mindful that an agency decision concerning which alternatives to consider is necessarily bound by a rule of reason and practicality." *Airport Neighbors Alliance, Inc. v. United States*, 90 F.3d 426, 432 (10th Cir. 1996). "[A]n agency need not analyze the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, . . . impractical or ineffective." *Id.* "While it is true that defendants could reject alternatives that did not meet the purpose and need of the project, they could not define the project so narrowly that it foreclosed a reasonable consideration of alternatives." *Davis*, 302 F.3d at 1119 (internal quotation marks omitted).

The Project was designed "to improve or maintain habitat conditions in order to promote long-term ecosystem health for the benefit of people, wildlife, and fish." 1 AR 000136 (Decision Notice and FONSI). The primary objective is to reduce densities of aspen and spruce stands that are at most risk of spruce beetle infestation, while maintaining a forested appearance. Under the secondary objective, the Project will supply local resource-dependent enterprises with raw materials in an "economically feasible manner." *Id.*

UEC argues that the Forest Service violated NEPA by defining the project's objectives so narrowly that the only possible alternatives were the proposed project or no action. It also contends that the Forest Service could have addressed

22

the spruce beetle infestation in non-commercial ways and considered alternatives that did not revalidate roadless areas. According to the Forest Service, a non-commercial alternative would achieve neither project objective. Given the Project's dual objectives and the agency's discretion to chose those objectives, *see Airport Neighbors Alliance*, 90 F.3d at 432, the Forest Service examined a reasonable range of alternatives and did not act arbitrarily when it considered only the no-action alternative and the modified proposed action.

## V. CONCLUSION

We REVERSE the district court's order affirming authorization of the Project and REMAND to the district court with instructions to VACATE the Forest Service's approval of the Project. We do not address whether the agency should apply the 1982 rule or the 2005 rule's transition provision during further proceedings.

*UEC v. Bosworth,* 03-4251

**WHITE**, District Judge, Concurring.


I respectfully offer this concurring opinion to highlight the impact of the intervening circuit precedent on the district court's decision. Admittedly, the opinion rendered today follows logically from the now binding holding in UEC I that §219.19 applies directly to project level activities in addition to the development, adoption and revision of the forest plan itself. The district court here would no doubt have ruled differently if it could have divined that project level management activities must strictly adhere to §219.19 procedures. Such a divination, however, was not possible. As the opinion in UEC I implicitly concedes, its holding was not compelled by the actual language of the regulation.

Nowhere in §219.19 does the term "project" appear. The explicit language of that section mentions only the "planning area." Indeed, UEC I mentions that even the plaintiff in that case conceded that "§219.19 applies to the development of Forest Management Plans, as opposed to specific project level actions[.]" Utah Environmental Congress v. Bosworth, 372 F.3d 1219, 1224 (10th Cir. 2004). UEC I's analysis also mentions: (1) that NFMA requires "resource management activities be consistent with the Forest Plan," Id., at 1225. (emphasis supplied); and, (2) that §219.27 "contemplates the application of §219.19 to management

activities[.]" Id., at 1225 (emphasis supplied). These two factors formed the foundation for UEC I's final conclusion that the regulations as a whole "anticipate" application of §219.19 to project level as well as plan level management actions. Id.

Thus, according to UEC I, the regulations "anticipate" and "contemplate" its final interpretation of §219.19. This is hardly a firm foundation for the conclusion that UEC I's interpretation is the only legally permissible one. Indeed, nowhere does UEC I state that its interpretation of §219.19 is the only legally permissible one. Furthermore, nowhere does UEC I explain exactly how the Forest Service's interpretation of the regulation was arbitrary and capricious.

Of course, that is not to say that UEC I's interpretation of §219.19 is illogical or unreasonable. Likewise, because that section is ambiguous at best with regard to the present issue, the interpretation of the Forest Service is also neither illogical or unreasonable. In short, project level actions may certainly still be "consistent" with the forest plan as a whole, without requiring wholesale imposition of §219.19 procedures onto each discrete project. A project may certainly be "consistent" with the forest plan when the Forest Service assesses a project's effects on MIS through the use of habitat information, population information, or a combination of the two.

In Dombeck, this Court emphasized that a "practical" interpretation of the

2

regulations must be taken "consistent with the 'overall multiple use objectives' and the 'inherent flexibility' of the National Forest Management Act." Colorado Envtl. Coalition v. Dombeck, 185 F.3d 1162, 1171 (10th Cir. 1999) (quoting Seattle Audubon Soc'y v. Mosely, 80 F.3d 1401, 1404 (9th Cir. 1996)). The project at issue here entails only 219 acres, or 1.46% of the entire 15,000 acre Thousand Lakes Mountain area. Therefore, in this case, even if not in all cases, the Forest Service's interpretation of §219.19 and its actions seem imminently reasonable.

The now controlling interpretation of §219.19 in UEC I may be the best interpretation. No doubt, that panel believed that its interpretation most effectively advances the goals of NFMA. Unfortunately, I believe that in finding the best interpretation, the UEC I panel substituted its judgment for that of the appropriate decision-maker. The interpretation of the Forest Service must be given deference, "especially when that interpretation involves questions of scientific methodology." Dombeck, at 1170 (citation omitted).

A disagreement about the interpretation of a Forest Service regulation might hardly seem to justify a concurring opinion, especially when, as now, the Forest Service has adopted new planning regulations. Thus, this particular interpretive issue is unlikely to be reviewed in future cases. The issue of consequence here, however, is not merely one involving proper interpretation of

3

regulations, but rather the proper separation of powers. That separation is breached when an agency's reasonable interpretation of a regulation is set aside in favor of a seemingly better one imposed by the judiciary.

But for the intercession of UEC I, I would affirm the district court. The obligations of stare decisis, however, compel me to concur respectfully in the result today.