**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 21, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

FOREST GUARDIANS and
CARSON FOREST WATCH,

      Plaintiffs-Appellants,

v.

UNITED STATES FOREST
SERVICE,

      Defendant-Appellee.
.

No. 06-2306
(D.C. No. 1:05-CV-00372-JB-DJS)
(D. N.M.)

---

**ORDER**

---

Before **BRISCOE**, Chief Judge, and **SEYMOUR, TACHA**[*]**, KELLY, LUCERO, MURPHY, HARTZ, O'BRIEN, TYMKOVICH, GORSUCH, HOLMES, and MATHESON**[**], Circuit Judges[***].

---

[*]     The Honorable Deanell R. Tacha participated in the en banc court's consideration of this matter while still on active status. She took senior status effective January 27, 2011, but has participated fully in this order.

[**]     The Honorable Scott M. Matheson, Jr., was officially sworn in on December 30, 2010. However, he did not participate in this order.

[***]     The Honorable Michael W. McConnell, who participated in the original panel decision, resigned his commission on August 31, 2009 and did not participate in the en banc court's consideration of this matter.

On March 8, 2010, this court entered an order granting the appellants' petition for *en banc* rehearing. Having now considered the parties' briefs and heard oral argument on the matter, the court has voted unanimously to vacate the March 8, 2010 order granting *en banc* rehearing as improvidently granted. As a result, that order is vacated.

The case is referred back to the original panel for action on the petition for panel rehearing. The remaining members of the original panel, who are in agreement on the matter, 28 U.S.C. § 46(d), grant the appellants' petition for panel rehearing pursuant to Federal Rule of Appellate Procedure 40. The previously issued opinion, *Forest Guardians v. U.S. Forest Service*, 579 F.3d 1114 (10th Cir. 2009), is withdrawn. The attached opinion is substituted in its place.

Entered for the Court,

ELISABETH A. SHUMAKER, Clerk

2

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 21, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

FOREST GUARDIANS and
CARSON FOREST WATCH,

      Plaintiffs - Appellants,

      v.

UNITED STATES FOREST
SERVICE,

      Defendant - Appellee.

No. 06-2306

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:05-CV-00372-JB-DJS)**

Steven Sugarman (Alletta Belin with him on the brief), Belin & Sugarman, Santa
Fe, New Mexico, for Plaintiffs-Appellants.

David C. Shilton, Attorney, Environment & Natural Resources Division,
Department of Justice (Ronald J. Tenpas, Assistant Attorney General; Andrew A.
Smith and Mark R. Haag, Attorneys, Environment & Natural Resources Division,
Department of Justice; Kathryn Toffenetti and Mary Ann Joca, Office of General
Counsel, U.S. Department of Agriculture, with him on the brief), Washington,
D.C., for Defendant-Appellee.

Before **SEYMOUR** and **HOLMES**, Circuit Judges.[****]

---

**PER CURIAM**.

---

### ORDER ON PETITION FOR REHEARING

---

This matter is before the court on Forest Guardians and Carson Forest Watch's petition for rehearing. The panel has voted to grant a limited rehearing to modify some of the language in our panel opinion. The court's opinion filed on August 26, 2009, is withdrawn and an amended opinion is attached to this order.

### OPINION

Plaintiffs-Appellants Forest Guardians and Carson Forest Watch (collectively, "Forest Guardians") challenge the approval by the United States Forest Service ("USFS") of a timber sale and restoration project in New Mexico's Carson National Forest, claiming violations of the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600 et seq., and the USFS's regulations. Forest Guardians sought declaratory and injunctive relief; the district court denied them

---

[****] The Honorable Michael W. McConnell, who participated in the panel decision regarding this appeal, resigned his commission on August 31, 2009. As a result, he did not participate in the reissuance of this opinion. The remaining two judges are in  agreement with respect to this disposition, however. *See* 28 U.S.C. § 46(d).

-2-

relief and granted judgment in favor of the USFS.  We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## I.  BACKGROUND

As part of the National Forest System, the Carson National Forest is maintained under a land and resource management plan (the "Carson Forest Plan"), pursuant to the NFMA, 16 U.S.C. § 1604.  The Carson Forest Plan was adopted in 1986 and "sets forth broad, programmatic management direction for the Carson National Forest."  J. App. at 151 (Admin. R. Excerpt, "Management Recommendations for the Northern Goshawk in the Southwestern United States," dated Aug. 1992); 16 U.S.C. § 1604(e).  The Carson Forest Plan includes a monitoring program that provides that Management Indicator Species ("MIS") be identified and that five years of baseline monitoring of each MIS be undertaken, followed by periodic monitoring of MIS population and trends.  MIS are analogous to the storied canaries of coal mines; "[t]hey are a 'bellwether' for other species that have the same special habitat needs or population characteristics and serve as a proxy for determining the effects of management activities on other species."  *Utah Envtl. Cong. v. Bosworth* (*UEC II*), 439 F.3d 1184, 1190 (10th Cir. 2006) (citation omitted) (internal quotation marks omitted). The Carson Forest Plan, as amended, identified eleven wildlife species, including

the Abert's squirrel,[1] as MIS used to monitor the condition of the forest's ecosystems. These species were "considered to be representative [of] a variety of other species . . . and were determined to reflect the habitat needs for the majority of the forest's species." J. App. at 214 (Admin. R. Excerpt, "Supplement to the Final Environmental Impact Statement for the Agua/Caballos Proposed Projects"). They "were selected because population changes are believed to indicate the effects of management activities that occur [in] the forest." *Id.*

To implement the Carson Forest Plan, the USFS approves plans and projects for specific areas of the Carson National Forest. *See Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 735 (1998). Such projects must be consistent with the applicable forest plan. *Utah Envtl. Cong. v. Bosworth* (*UEC III*), 443 F.3d 732, 737 (10th Cir. 2006) (citing the NFMA "consistency clause," 16 U.S.C. § 1604(i)). The Agua/Caballos Project ("A/C Project"), at issue here, consists of site-specific silvicultural treatments,[2] timber cutting and sales, and related

---

[1] David R. Patton, *A Model to Evaluate Abert Squirrel Habitat in Uneven-Aged Ponderosa Pine*, 12 Wildlife Soc'y Bull. 408, 408 (1984) ("The Abert squirrel has been described as unique among North American mammals. This uniqueness is exemplified by its conspicuous tufts of hair on its ears, by variation in the color pattern of isolated populations, and by its close association with a single tree species—ponderosa pine . . . ." (citation omitted)). The Abert's squirrel is also referred to as the "tassel-eared squirrel." Aplee. Supp. App. at 414.

[2] *See generally McGraw-Hill Dictionary of Scientific and Technical Terms* 1935 (6th ed. 2003) (defining "silviculture" as "[t]he theory and practice of controlling the establishment, composition, and growth of stands of trees for any

(continued...)

activities. The A/C Project was proposed in 1992, and it was first approved by the USFS in June 2002. Several parties, including the Appellants here, successfully appealed the approval on the grounds that the plan's MIS analysis was incomplete. The A/C Project was remanded to the USFS to complete the MIS analysis, i.e., to evaluate the effects of the project on the identified MIS, and to solicit further public comment and issue a new decision.

After the USFS undertook an updated forest-wide MIS assessment and sought comments, the revised A/C Project was approved in April of 2004 in a Record of Decision (the "ROD"). On July 12, 2004, Forest Guardians filed an administrative appeal of the USFS's final approval of the A/C Project; that appeal was rejected in August of 2004. Forest Guardians then filed this action in federal district court alleging that the USFS's approval of the A/C Project violated the NFMA, the National Environmental Protection Act ("NEPA"), and the USFS's regulations. The district court denied relief. The court declined to address the merits of Forest Guardians' NEPA claim because it found those claims had not been administratively exhausted. Similarly, the court declined to reach the merits of Forest Guardians' NFMA regulatory claim. Regarding that claim, after

---

[2](...continued)
of the goods and benefits that they may be called upon to produce"); *see also id.* at 2014 (defining "stand" as "[a] group of plants, distinguishable from adjacent vegetation, which is generally uniform in species composition, age, and condition"); XVI *The Oxford English Dictionary* 489 (2d ed. 2001) (defining "stand" as "[a] standing growth or crop . . . spec. one of trees").

determining that the USFS's 2000 transition regulations applied to the A/C Project, the court held that Forest Guardians had not administratively exhausted any claim that the USFS failed to consider the 2000 regulations. Finally, the district court held that the USFS had not violated either the NFMA's consistency provision or its substantive provision. Forest Guardians now appeals.[3]

## II. DISCUSSION

### A. *Standard of Review*

Because the NFMA does not provide a private right of action, we review the USFS's approval of the A/C Project as a final agency action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500 et seq. *UEC III*, 443 F.3d at 739. The district court's decision is considered de novo, but we will not overturn the decision of the USFS "unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.* (quoting 5 U.S.C. § 706(2)(A)).

> While administrative agencies generally are afforded a presumption of regularity, an agency's decision will nonetheless be arbitrary and capricious if the agency entirely . . . failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. Furthermore, we must determine whether the disputed decision was based on consideration of the relevant factors and whether there has been a clear error of judgment. Deference to the agency is especially strong where the challenged decisions

---

[3] Forest Guardians does not pursue its NEPA claim on appeal.

> involve technical or scientific matters within the agency's area of expertise.

*Id.* (citations omitted) (internal quotation marks omitted).

## B. Approval of the A/C Project and Administrative Exhaustion

### 1. Forest Guardians' Failure to Exhaust

In 1982, the USFS revised its planning regulations ("the 1982 Rules"), 36 C.F.R. pt. 219 (1999), which govern USFS's management at both the program and project levels. In November 2000, the USFS significantly amended these regulations and replaced them with the 2000 planning rules, codified at 36 C.F.R. pt. 219 (2001). National Forest System Land and Resource Management Planning, 65 Fed. Reg. 67,514, 67,568–81 (Nov. 9, 2000); *see UEC III*, 443 F.3d at 737. Rather than being immediately promulgated, these new regulations provided that from November 9, 2000, until the promulgation of a new, final rule, the USFS "must consider the best available science [or "BAS"] in implementing . . . [a forest] plan." 36 C.F.R. § 219.35(a) (2001). These transition provisions ultimately remained effective until new rules were implemented in January 2005; similarly, these new rules prescribe that the USFS "must take into account the best available science." 70 Fed. Reg. 1023, 1027 (Jan. 5, 2005); *see* 36 C.F.R. §§ 219.11 (2008).

As thoroughly explained by the district court, Forest Guardians had argued to the agency that the 1982 Rules were applicable to the USFS's evaluation and

approval of the A/C Project. J. App. at 79, 83 (Dist. Ct. Mem. Op. & Order, filed Aug. 22, 2006). Forest Guardians adopted the same position in its initial filings with the district court. *See* Aplt. Opening Br. Attach. at 31. Now, on appeal, Forest Guardians does not dispute the district court's contrary, accurate conclusion that the 2000 transition provisions and their BAS standard, rather than the 1982 Rules, apply to the A/C Project; "any projects proposed during the transition period must conform with the best available science standard set forth in the 2000 transition provisions." *UEC III*, 443 F.3d at 747; *see id.* at 746 (concluding, based on the USFS's interpretive rule adopted in 2004, that "during the transition period between November 2000 and promulgation of a final rule, the Forest Service should use the 'best available science' under § 219.35(a) for project decisions" (quoting *UEC II*, 439 F.3d at 1189) (internal quotation marks omitted)).[4] Rather, Forest Guardians' primary argument is directed toward the USFS's alleged failure to consider and apply the BAS standard in evaluating the project and the inequity of expecting Forest Guardians to present arguments regarding the BAS standard during the administrative appeal process.

---

[4] Because this September 2004 interpretive rule was not issued until after the administrative appeal process was completed in this case, we point to that rule only as further support for the now-undisputed conclusion that the 2000 BAS standard was applicable to the A/C Project. National Forest System Land and Resource Management Planning; Use of Best Available Science in Implementing Land Management Plans, 69 Fed. Reg. 58,055, 58,055–56 (Sept. 29, 2004). The interpretive rule clearly prescribed that "the 1982 rules are no longer applicable for projects proposed during the transition period." *UEC III*, 443 F.3d at 747.

We previously have explained why the applicability of the 1982 Rules versus the 2000 transition provisions and their BAS standard can be an important distinction in the evaluation of forest plans:

> Deciding whether the 1982 regulations apply to the Project . . . is important because the 1982 regulations and the 2000 transition provisions contain key differences governing species monitoring. The 1982 rules, for example, require the Forest Service to monitor the "population trends of the management indicator species" and determine "relationships to habitat changes." 36 C.F.R. § 219.19(a)(6). And we have held that these obligations apply to "project level as well as plan level management actions." Conversely, the 2000 transition provisions contain no such explicit language governing monitoring but merely require "the responsible official to consider the best available science in implementing" a forest plan. 36 C.F.R. § 219.35(a), (d) (2001); 65 Fed. Reg. 67,514, 67,579 (Nov. 9, 2000).

*UEC III*, 443 F.3d at 744–45 (alterations and second citation omitted); *see also UEC II*, 439 F.3d at 1190 (stating that "the standards of the 1982 Rules and the 2000 Transitional Rule are—at least—distinct" (quoting *Forest Watch v. U.S. Forest Serv.*, 410 F.3d 115, 117 (2d Cir. 2005))); *Sierra Club v. Wagner*, 555 F.3d 21, 25 (1st Cir. 2009) ("One might think from the name that 'best available science' is an unexceptionable standard, but according to [the plaintiff], the 1982 rules provided a set of precise tests for evaluating a project's impact on species that are more rigorous and were intentionally weakened by the 2000 rules."). This court and others have run into confusion in applying the 2000 transition provisions. *See UEC III*, 443 F.3d at 745 (citing cases).

Forest Guardians asserts that the USFS failed to consider or apply the 2000 BAS standard in planning and approving the A/C Project. Forest Guardians further argues that the A/C Project's approval would be affected by the "key differences" between that standard and the 1982 Rules. *Cf. Wagner*, 555 F.3d at 25–26 (finding that the plaintiff had forfeited its argument regarding the applicability of the 1982 Rules when it had neither raised the argument to the district court nor explained "whether or how the allegedly more rigorous standards of the 1982 rules would likely have altered the Forest Service's ultimate evaluation of the two projects"). The district court, however, determined that because Forest Guardians failed to raise the BAS argument during the administrative appeal process—instead arguing that the 1982 Rules applied—Forest Guardians failed to exhaust this claim, as is necessary for judicial review. The district court found that it lacked subject matter jurisdiction over the BAS argument. We review de novo the district court's jurisdictional conclusion. *Urban ex rel. Urban v. Jefferson County Sch. Dist. R-1*, 89 F.3d 720, 724 (10th Cir. 1996).

Plaintiffs must exhaust available administrative remedies before the USFS prior to bringing their grievances to federal court. 7 U.S.C. § 6912(e)[5]; 36 C.F.R.

[5] The statute prescribes:

Notwithstanding any other provision of law, a person shall exhaust all administrative appeal procedures established by the Secretary or

(continued...)

-10-

§ 215.21. To satisfy the exhaustion requirement, plaintiffs "generally must structure their participation so that it alerts the agency to the parties' position and contentions, in order to allow the agency to give the issue meaningful consideration." *Forest Guardians v. U.S. Forest Serv.*, 495 F.3d 1162, 1170 (10th Cir. 2007) (quoting *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004)) (internal quotation marks omitted). "Claims not properly raised before an agency are waived, unless the problems underlying the claim are 'obvious' or otherwise brought to the agency's attention." *Id.* (citation omitted). The claim must be presented "in sufficient detail to allow the agency to rectify the alleged violation." *Id.*; *see also Kleissler v. U.S. Forest Serv.*, 183 F.3d 196, 202 (3d Cir. 1999) ("[T]he claims raised at the administrative appeal and in the federal complaint must be so similar that the district court can ascertain that the agency was on notice of, and had an opportunity to consider and decide, the same claims now raised in federal court."); *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 965 (9th Cir. 2002) ("Claims must be raised with sufficient clarity to

[5](...continued)
required by law before the person may bring an action in a court of competent jurisdiction against–

      (1) the Secretary;

      (2) the Department; or

      (3) an agency, office, officer, or employee of the Department.

7 U.S.C. § 6912(e).

allow the decision maker to understand and rule on the issue raised, but there is

no bright-line standard as to when this requirement has been met . . . .").  The

exhaustion requirement thus helps prevent premature claims and "ensure[s] that

the agency possessed of the most expertise in an area be given first shot at

resolving a claimant's difficulties."[6]  *Id.*

---

[6]     Indeed, courts and legal scholars have opined extensively upon the numerous policy justifications that support the application of the exhaustion doctrine in the administrative context.  As a theory, "exhaustion promotes the twin general goals of protecting administrative agency authority and promoting judicial efficiency."  John C. Dubin, *Torquemada Meets Kafka: The Misapplication of the Issue Exhaustion Doctrine to Inquisitorial Administrative Proceedings*, 97 Colum. L. Rev. 1289, 1309 (1997); *see also United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952) ("[O]rderly procedure and good administration require that objections to the proceedings of an administrative agency be made while it has opportunity for correction in order to raise issues reviewable by the courts.").  According to Dubin, embodied within these general goals are four specific objectives:

> (1) implementing congressional intent to delegate authority to the agency by discouraging frequent and deliberate flouting of administrative procedures; (2) further protecting agency autonomy by allowing the agency in the first instance to apply its special expertise and correct its errors; (3) providing more efficient judicial review by permitting the parties to develop the facts of the case in the agency proceedings; and (4) promoting judicial economy by avoiding needless repetition of administrative and judicial factfinding and perhaps mooting the judicial controversy.

Dubin, *supra*, at 1307.

In practice, "the requirement that plaintiffs exhaust their administrative remedies . . . greatly minimizes the threat of sandbagging"—i.e., the concern that plaintiffs will "shirk their duty" to raise claims before the agency, "only to present new evidence at trial that undermines" the agency's decision.  Susannah

(continued...)

-12-

The district court concluded that § 6912(e)'s exhaustion requirement is jurisdictional. Administrative exhaustion is often an affirmative defense, rather than a jurisdictional prerequisite. *See Jones v. Bock*, 549 U.S. 199, 212 (2007) ("[T]he usual practice under the Federal Rules is to regard exhaustion as an affirmative defense."). Judicially created exhaustion doctrines, in particular, are prudential in nature. *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992), *superseded by statute on other grounds*, Prison Litigation Reform Act of 1995, Pub. L. No. 104-134, 110 Stat. 1321 (1996). But a statutory exhaustion requirement may be jurisdictional if it provides "more than simply a codification of the judicially developed doctrine of exhaustion." *Weinberger v. Salfi*, 422 U.S. 749, 765–66 (1975). We must evaluate each statute separately, showing "regard for the particular administrative scheme at issue." *Id.*; *see also McCarthy*, 503 U.S. at 144 ("Of 'paramount importance' to any exhaustion inquiry is congressional intent." (quoting *Patsy v. Bd. of Regents of Fla.*, 457 U.S. 496, 501 (1982))). Among other criteria, we look for "sweeping and direct statutory

---

[6](...continued)
T. French, *Judicial Review of the Administrative Record in NEPA Litigation*, 81 Calif. L. Rev. 929, 972–73 (1993); *see also* Lori Oosterbaan, Note, *From Misapplication to No Application of the Issue Exhaustion Doctrine in Social Security Cases:* Sims v. Apfel, 32 Loy. U. Chi. L.J. 693, 704 (2001) (explaining that the exhaustion doctrine "prevents the claimant from unfairly surprising the agency with new issues upon judicial review"); *see also Brotherhood of Ry., Airline & S.S. Clerks v. St. Louis Sw. Ry. Co.*, 676 F.2d 132, 139 (5th Cir. 1982) ("Permitting the parties to hide trumps up their sleeve for appeal can only exalt endless gamesmanship over fair play and finality of judgment.").

language that goes beyond a requirement that only exhausted actions be brought." *Steele v. Fed. Bureau of Prisons*, 355 F.3d 1204, 1208 (10th Cir. 2003) (quoting *Underwood v. Wilson*, 151 F.3d 292, 294 (5th Cir. 1998)) (internal quotation marks omitted), *overruled in part on other grounds by Bock*, 549 U.S. at 214–15; *see also Salfi*, 422 U.S. at 757 (noting that the section's language was "sweeping and direct and [ ] states that no action shall be brought under § 1331, not merely that only those actions shall be brought in which administrative remedies have been exhausted").

The courts of appeals are split as to whether 7 U.S.C. § 6912(e) is jurisdictional. *See Dawson Farms, LLC v. Farm Serv. Agency*, 504 F.3d 592, 603–06 (5th Cir. 2007) (discussing the views of the various circuits). We need not resolve this issue. Regardless of whether it is jurisdictional, the explicit exhaustion requirement in § 6912(e) is, nonetheless, mandatory. *Forest Guardians*, 495 F.3d at 1170; *McCarthy*, 503 U.S. at 144 ("Where Congress specifically mandates, exhaustion is required."); *see also Bastek v. Fed. Crop Ins. Corp.*, 145 F.3d 90, 94–95 (2d Cir. 1998) (noting that § 6912(e) "unambiguously required plaintiffs to exhaust their administrative remedies before bringing suit, and their failure to do so deprived them of the opportunity to obtain relief in the district court"). Forest Guardians concedes that it did not exhaust its BAS argument during the administrative process. It suggests that we should excuse the exhaustion requirement, but its arguments are unavailing.

-14-

Section 6912(e) does not contain any explicit exceptions to the exhaustion requirement. However, judicially created exhaustion doctrines are "subject to numerous exceptions," *McKart v. United States*, 395 U.S. 185, 193 (1969), and several circuits have extended these exceptions to § 6912(e). [7] *See Dawson Farms*, 504 F.3d at 606 (discussing § 6912(e) and the "extraordinary circumstances" and "limited bases" warranting an excuse of administrative exhaustion); *Ace Prop. & Cas. Ins. Co. v. Fed. Crop Ins. Corp.*, 440 F.3d 992, 1000 (8th Cir. 2006) (noting that exhaustion under § 6912(e) may be excused "if the complaint involves a legitimate constitutional claim, if exhaustion would cause irreparable harm, if further administrative procedures would be futile, or if the issues to be decided are primarily legal rather than factual" (citation omitted)); *McBride Cotton & Cattle Corp. v. Veneman*, 290 F.3d 973, 980–82 (9th Cir. 2002) (excusing a failure to exhaust under § 6912(e) where the suit alleged a constitutional claim that was colorable, collateral to the substantive claim, and its resolution would not serve the purposes of exhaustion because exhaustion would be futile); *cf.* Marcia R. Gelpe, *Exhaustion of Administrative Remedies: Lessons from Environmental Cases*, 53 Geo. Wash. L. Rev. 1, 26, 64–65 (1984) (discussing judicially created exceptions to exhaustion in the environmental litigation context, observing that "exceptions to the exhaustion requirement are

---

[7]     *But see Bastek*, 145 F.3d at 94–95 (refusing to consider exceptions to § 6912(e)'s requirement because "courts are not free to dispense with" such a mandatory statutory exhaustion requirement).

-15-

not clearly delineated," and arguing that courts "should be more insistent on requiring exhaustion of administrative remedies in environmental cases" and, more specifically, that "if there is significant doubt whether the facts fall into an exception [to the exhaustion doctrine], courts should require exhaustion"). We have never decided which, if any, of these exceptions are applicable, nor need we do so now. Even assuming that we could bypass § 6912(e)'s express direction, no exception is warranted on the facts of this case.

Forest Guardians argues that it would have been futile to present its BAS challenge to the agency because the USFS has already adopted the position in federal court that it considered and applied the BAS standard of the 2000 regulations to the A/C Project decision. *See Frontier Airlines, Inc. v. Civil Aeronautics Bd.*, 621 F.2d 369, 370–71 (10th Cir. 1980) (excusing a statutory exhaustion requirement under agency's "reasonable grounds" exception because, *inter alia*, the agency "in this Court [wa]s adamant in its belief that it does have the authority to" take the challenged action). But despite the USFS's perceived stance on that issue, exhaustion of the BAS argument would not have been "futile" in the sense that courts have applied this exhaustion exception. Specifically, there is no argument that: the USFS lacked the authority or the ability to resolve the challenge to the project approval, *see McBride Cotton & Cattle Corp.*, 290 F.3d at 982; *Ace Prop. & Cas. Ins. Co.*, 440 F.3d at 1000–01; this is purely a question of statutory interpretation, *see Frontier Airlines*, 621

F.2d at 371; or the court would not benefit from allowing the USFS to develop a full administrative record on the issue for our review, *see Ace Prop. & Cas. Ins. Co.*, 440 F.3d at 1000–02; *see also Salfi*, 422 U.S. at 765 ("Exhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review."). Thus, assuming, *arguendo*, we could excuse § 6912(e)'s exhaustion requirement, Forest Guardians has not proffered reasons that demonstrate that an exception is warranted.

Forest Guardians further argues that administrative exhaustion of the BAS argument should not be required because it would be unfair to require exhaustion of a claim that it did not know that it had at the time it filed its administrative appeal. Forest Guardians reasons that when it filed its appeal with the USFS in July 2004, Tenth Circuit case law indicated that the 1982 Rules would be applicable to the A/C Project. Forest Guardians points to *Utah Environmental Congress v. Bosworth* (*UEC I*), 372 F.3d 1219 (10th Cir. 2004), which was issued on June 23, 2004. Related decisions in this circuit dealing with the application of the 1982 Rules and the 2000 BAS standard were not released until after the administrative appeal was decided in August 2004. It is true that in *UEC I*, we applied the 1982 Rules under the stated rationale that they were the regulations in

effect in December 2000, the time of the USFS decision at issue. *UEC I*, 372 F.3d at 1222 n.1. We also noted, however, that the regulations had changed in 2000. *Id.* In addition, Judge Baldock's concurrence observed that "the Forest Service's adoption of new planning regulations effectively moots the issue [of interpreting the 1982 Rules] in future cases." *Id.* at 1232 n.1 (Baldock, J., concurring). Accordingly, even though the 1982 Rules were applied in *UEC I*, that same case provided Forest Guardians—pre-administrative appeal—with notice that the 1982 Rules would not necessarily apply to the A/C Project.

It is not inequitable to require Forest Guardians to have made an argument about the 2000 BAS standard in July 2004, even if there was some confusion as to the proper standard. Forest Guardians' reliance on *Bowen v. City of New York*, 476 U.S. 467, 482–87 (1986), for the proposition that requiring exhaustion would be unfair, is misplaced. In *Bowen*, the Supreme Court waived the administrative exhaustion requirement because plaintiffs had been subjected to an "unrevealed policy that was inconsistent in critically important ways with established regulations." *Id.* at 485. Here, by contrast, the published federal regulation in effect on the date Forest Guardians filed its administrative appeal indicated that during the transition period beginning November 9, 2000, "the responsible official must consider the best available science in implementing and, if appropriate, amending the current plan." 36 C.F.R. § 219.35(a); *see also Forest Watch*, 410 F.3d at 118 ("[T]he plain language of the 2000 Transitional Rule

-18-

dictates that the 'best available science' standard applies when the agency is 'implementing' a forest plan during the relevant time period.").  Thus, rather than being victimized by an unpublished policy, Forest Guardians was provided notice by the plain language of the regulation that the applicability of the 2000 BAS standard was, at the very least, a pertinent issue.  In addition, the ensuing uncertainty regarding the application of the 1982 Rules and the 2000 BAS standard was commented upon publicly by courts as well as the USFS prior to the filing of Forest Guardians' administrative appeal.  *See, e.g.*, *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 967–69 (9th Cir. 2003) (noting concerns that arose regarding the 2000 transition provisions); National Forest System Land and Resource Management Planning; Extension of Compliance Deadline, 66 Fed. Reg. 27,552 (May 17, 2001).  We would expect such public commentary to have conveyed to a litigant the potential applicability of the BAS standard to a project in July 2004 and, consequently, the reasonableness of advancing an argument relating to that standard, even if only as an alternative to a 1982 Rules argument.

Therefore, because Forest Guardians did not argue during the administrative process that USFS failed to consider and apply the 2000 BAS standard when it implemented the A/C Project, we conclude that Forest Guardians failed to adequately present the BAS argument in its administrative appeal and thus has forfeited it.  *See Forest Guardians*, 495 F.3d at 1171; *cf. Utah Envtl.*

-19-

*Cong. v. Troyer* (*UEC IV*), 479 F.3d 1269, 1288, 1292 (10th Cir. 2007)

(McConnell, J., dissenting in part) ("At no point has plaintiff UEC argued that the

projects violated the 'best available science' standard . . . . If UEC had argued

that the decisions in question were deficient under the 'best available science'

standard, the Forest Service would have been able to respond, and the district

court would have been able to make appropriate findings."). Therefore, we do not

reach the merits of Forest Guardians' BAS claim.[8]

---

[8] Forest Guardians suggests that our decision in *Ecology Center, Inc. v. U.S. Forest Serv.*, 451 F.3d 1183 (10th Cir. 2006), requires us to reverse the approval of the A/C Project. In *Ecology Center*, the USFS had approved a project based on the 1982 Rules. *Id.* at 1192. However, we concluded that the 2000 transition provisions, and in particular the BAS standard, applied. *Id.* at 1191–92. We pointed out that neither party had provided the Record of Decision, and that the excerpt of the ROD offered by the Forest Service "does not even include the phrase 'best available science' anywhere in the pages provided." *Id.* at 1192 n. 3. We noted that "'a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency.'" *Id.* at 1195 (alteration omitted) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). Because the USFS applied the wrong standard, we remanded the case to the district court with instructions to vacate the approval of the project. Moreover, we did so without regard to the specific challenges raised by the plaintiffs. *Id.* ("[W]e need not decide if Ecology Center's myriad of pointed arguments regarding Forest Services's failure to comply with the Forest Plan's habitat and monitoring requirements demonstrates that the Forest Service engaged in a clear error of judgment when it approved the Griffin Springs Project."). We reached a similar decision in *UEC IV*, 479 F.3d at 1287–88, and in *Utah Envtl. Cong. v. Richmond* (*UEC V*), 483 F.3d 1127, 1136 (10th Cir. 2007) (noting that "we are faced with the same scenario we encountered in *Ecology Center*").

As we proceed to hold in the following section, however, the USFS in this case applied the correct standard—the best available science—as well as the 1982 Rules. Thus, while the USFS's failure to consider the "best available science" in
(continued...)

### 2. *Forest Guardians'* **Chenery** *Argument*

The Supreme Court's decision in *SEC v. Chenery Corporation* stands for the proposition that a reviewing court may not affirm an agency decision based on reasoning that the agency itself never considered in its administrative proceedings. *See Chenery*, 318 U.S. at 87. Forest Guardians contends that affirmance of the district court's order would violate *Chenery* because we would be upholding the USFS's decision when it "did not consider or mention – let alone apply – the controlling 'best available science' standard of the 2000 regulations when it planned and authorized the Agua-Caballos timber sale project." Pl-Aplt's Amended Reply Br. at 1.

We disagree. Even assuming, *arguendo*, that the practical *effect* of the district court's decision was to permit USFS to prevail on the merits against Forest Guardians based on the BAS standard, we conclude that this outcome would not contravene *Chenery*. To be sure, the USFS approved the A/C Project under the 1982 Rules. But it could also approve the project at the same time as representing the best available science. And our review of the record shows that the USFS did just that.

In *Chenery*, managers of the Federal Water Service Corporation ("Federal") sought approval of a corporate reorganization plan by the Securities and

---

[8](...continued)
*Ecology Center* and *UEC IV* required us to remand its decisions in those cases, we need not do so here.

Exchange Commission ("SEC"). *Chenery*, 318 U.S. at 82. The plan provided that the company's class B common stock would be surrendered for cancellation, and that its preferred and class A common stock would be converted into common stock of a new corporation. *Id.* at 84. While the plan was pending, several officers, directors, and controlling stockholders of Federal (collectively, "respondents") purchased over 12,000 shares of preferred stock in the new company. *Id.* Aware of this development, the SEC approved of Federal's reorganization plan only upon the condition that the preferred stock that the respondents acquired would not be permitted to share on parity with other preferred stock, reasoning that respondents, as managers of Federal, were fiduciaries who were obligated under their "duty of fair dealing" to refrain from trading in the securities of the corporation while the reorganization plan was pending. *Id.* at 85. In reaching this conclusion, the SEC's "opinion plainly show[ed] that . . . [its] decision . . . was explicitly based upon the applicability of principles of equity announced by courts." *Id.* at 87. The respondents then challenged the SEC's conditional approval of the reorganization plan in federal court.

On appeal, the SEC defended its decision under the court-announced equitable principles. *Id.* at 88–89. Additionally, however, it offered an alternative justification for its decision: even if the court declined to uphold its decision on equitable grounds, "the order should nevertheless be sustained

-22-

because the effect of trading by management is not measured by the fairness of individual transactions between buyer and seller, but by its relation to the timing and dynamics of the reorganization which the management itself initiates and so largely controls." *Id.* at 90 (internal quotation marks omitted).

In addressing the SEC's arguments, the Court first rejected its reliance upon principles of equity, concluding that, contrary to the SEC's determination, "courts do not impose upon officers and directors of a corporation any fiduciary duty to its stockholders which precludes them, merely because they are officers and directors, from buying and selling the corporation's stock." *Id.* at 88. Next, the Court suggested that the SEC's alternative argument potentially could have supported its decision. *Id.* 90–92. However, it explicitly declined to consider the merits of that argument, concluding that the SEC's "action must be judged *by the standards which the Commission itself invoked.*" *Id.* at 89 (emphasis added). Because the SEC's alternative argument was not "[that] upon which its action was based," the Court held that its decision could not be sustained on that ground. *Id.* at 92.

Therefore, in *Chenery*, the Supreme Court endeavored to preclude agencies from fashioning post-hoc justifications for their actions. *See, e.g.*, *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004) ("[T]o the extent a harmless-error determination rests on . . . matters not considered by the [administrative law judge], it risks violating the general rule against post hoc justification of

-23-

administrative action recognized in *SEC v. Chenery . . .* and its progeny."

(citation omitted)); *NLRB v. Indianapolis Mack Sales & Serv., Inc.*, 802 F.2d 280,

285 (7th Cir. 1986) ("The [agency's] appellate counsel cannot fill in the holes in

the agency's decision . . . .").

In complying with the *Chenery* principle, we must "look to the [agency's]

opinion" in order to "ascertain the precise basis of its determination." 318 U.S. at

87. In other words, we must thoroughly examine the administrative record to

ensure that the agency's proffered justifications for its decision reflect the

reasoning upon which it actually relied. And our prior cases involving the 2000

transitional rules did exactly that, examining the USFS's decisions and the

underlying documents to ascertain whether the agency made reference to the 2000

rules or to the BAS standard. *Compare UEC IV*, 479 F.3d at 1287 ("Although we

have concluded that the Forest Service was bound to apply the best available

science standard . . . it is obvious from the record on appeal that the Forest

Service failed to do so."), *and UEC V*, 483 F.3d at 1136 ("In this case, there is no

evidence that the Forest Service utilized the 'best available science' standard . . . .

Indeed, the ROD approving the project never used the phrase 'best available

science,' much less considered the substantive quality of the science utilized in

approving the project."), *with Utah Envtl. Cong. v. Russell* (*UEC VI*), 518 F.3d

817, 830 (10th Cir. 2008) ("Although the Forest Service did not specifically *cite*

the 2000 regulation requiring application of the best available science standard in

its Decision Notice, the administrative record establishes that the agency *considered* the best available science . . . .").

As in *UEC VI*, our examination of the record before us reveals that, even though the USFS did not explicitly cite the 2000 transitional rules in the ROD pertaining to the A/C Project, it considered and relied upon what it believed to be the BAS when it approved the Project.[9] *See UEC VI*, 518 F.3d at 830. More specifically, we conclude that the record in this case is far from "barren," *see Chenery*, 318 U.S. at 93, of any indication that the USFS applied the BAS standard.

As the district court recognized, the A/C Project ROD explicitly stated that the USFS was relying upon the "best available scientific information" when it approved the A/C Project. *See* J. App. at 87 ("The 'monitoring plan, like the EIS, is based on the *best available scientific information* at this time, some of which is referenced in the EIS.'" (emphasis added) (quoting J. App. at 291 (A/C Project

_____

[9]     Indeed, the district court recognized this possibility. At a July 20, 2006, hearing the court stated:

> *But there's nothing in the UEC [III] decision that says that the agency can't have considered both standards. And even though the agency doesn't cite to the 2000 transition provision, they do say that they were using the best available scientific information.*
>
> Unlike Ecology Center, here the Forest Service did consider the best available science standard, as they stated in the ROD . . . .

J. App. at 361 (Mot. Hr'g Tr., dated July 20, 2006) (emphasis added).

ROD, dated May 2004))).  As the A/C Project ROD explains, the Project was designed to comply with the Carson Forest Plan, as well as the amendments to that Plan.  *Id.* at 298.  In the ROD regarding the 1996 Amendment to the Carson Plan, the USFS observed that it had employed "[t]he *best available scientific data and information* on habitat needs for goshawk and Mexican spotted owl . . . to develop and evaluate the proposed action and alternatives," Aplee. Supp. App. at 432 (1996 Amendment ROD) (emphasis added), and recognized that the "Management Recommendations for Northern Goshawk in the Southwestern US [(Reynolds, et al. 1992)]" ("Reynolds Report"), was the "*best known information* on northern goshawk management in [the] Region," *id.* at 428 (emphasis added); *see also id.* at 426 ("There was no compelling proof that other information or recommendations offered were *better than the science* my resource specialists used." (emphasis added)).  The Reynolds Report is then cited in the A/C Project ROD, *see* J. App. at 293, in the Final Environmental Impact Statement to the Agua/Caballos Project ("FEIS"), *see* Aplee. Supp. App. at 449, 480, in the subsequent Final Supplement to the Final Environmental Impact Statement for the Agua/Caballos Proposed Projects ("FSFEIS"), *see* Aplee. Supp. App. at 480, 492, 524, and in the Management Indicator Species Assessment for the Carson National Forest ("MIS"), *see* J. App. at 199, 206.[10]  Since the A/C Project

---

[10]    The Reynolds Report "describe[s] the Abert's squirrel as an important prey species for the goshawk."  J. App. at 199.  At the very least then,
(continued...)

implemented the Carson Forest Plan, as amended in 1996, this demonstrates that the USFS considered and applied what it believed to be the best available science—the Reynolds Report—when it approved the Project. *See* J. App. at 289 (discussing the 1996 Amendment in the introductory section).

Moreover, the record contains evidence that the USFS also considered what *Forest Guardians* proffered as the "best available science" when it approved the A/C Project. In its supplemental brief addressing this court's inquiry regarding evidence of the BAS standard in the administrative record, Forest Guardians criticized the USFS's reliance upon the Reynolds report, contending that Dr. Jennifer Frey's 2003 Monitoring Report ("Frey Report"), J. App. at 227–45, and Dr. Norris Dodd's Management Guidelines ("Dodd Guidelines") represented the "best available science" at the time that the A/C Project was approved. *See* Aplt. Supp. Br. at 2–4, 6. Both the Frey Report and the Dodd Guidelines, however, are referenced repeatedly throughout the FSEIS. *See* Aplee. Supp. App. at 496, 503, 518. Furthermore, the USFS actually relied upon these documents, concluding

—————————

[10](...continued)
the Reynolds Report's management analysis with respect to the goshawk was directly germane to the management and viability of the Abert's squirrel, the MIS at issue here. *See* Aplee. Supp. App. at 415 (presenting the Reynolds Report's analysis of "[s]pecial [h]abitat [n]eeds" of the Abert's squirrel); *see also id.* (listing the Abert's squirrel (i.e., "[t]assel-eared squirrel") as one of the prey species of the goshawk and noting that "information" concerning the "special habitat needs" of "these selected prey species" was "gleaned" from the scientific "literature" in "identify[ing] a set of 'desired forest conditions' needed to provide abundant and sustainable populations of each of these species").

that "[s]urveys for Abert's squirrel activity areas in stands identified for treatment in the Agua/Caballos analysis area *[would] be based on Dodd and Frey*." *Id.* at 503 (emphasis added). In sum, in formulating and finalizing the A/C Project ROD, the USFS considered the "best available science"—as the substance of that term was understood in this case by the USFS *and* by Forest Guardians.

It should not be very surprising that the USFS relied upon the BAS to ensure that the A/C project complied with the 1982 Rules. Operating under the 1982 Rules, the USFS was required to rely on scientific evidence offered by experts who had studied the particular species that the Project impacted. For example, the 1982 Rules required an interdisciplinary scientific approach in creating forest plans and implementing the goals of the regulations and the plans. *See* 36 C.F.R. § 219.5 (1983). In pertinent part, the Rules provided:

> (a) A team representing several disciplines shall be used for regional and forest planning to insure coordinated planning of the various resources. *Through interactions among its members, the team shall integrate knowledge of the physical, biological, economic and social sciences*, and the environmental design arts in the planning process. . . .
>      . . . .
>
> (b) In appointing team members, the responsible line officer shall determine and consider the qualifications of each team member on the basis of the complexity of the issues and concerns to be addressed through the plan. *The team shall collectively represent diverse specialized areas of professional and technical knowledge applicable to the planning area, and the team members shall have recognized relevant expertise and experience in professional, investigative, scientific, or other responsible work in speciality areas which they collectively represent.* The

team may consist of whatever combination of Forest Service staff and other Federal government personnel is necessary to achieve an interdisciplinary approach. *The team is encouraged to consult other persons when required specialized knowledge does not exist within the team itself.*

*Id.* § 219.5(a), (b) (emphasis added).  With respect to the management of wildlife resources (such as the Abert's Squirrel, which is the subject of the controversy in this case), the 1982 Rules provided:

> Fish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area.  For planning purposes, a viable population shall be regarded as one which has the estimated numbers and distribution of reproductive individuals to insure its continued existence is well distributed in the planning area. . . .
>
> (a) Each alternative shall establish objectives for the maintenance and improvement of habitat for management indicator species selected under paragraph (g)(1) of this section, to the degree consistent with overall multiple use objectives of the alternative. *To meet this goal, management planning for the fish and wildlife resource shall meet the requirements set forth in paragraphs (a)(1) through (a)(7) of this section.*

*Id.* § 219.19 & (a) (emphasis added).  With respect to the habitat of management indicator species (of which the Abert's Squirrel is the relevant one in this case), subparagraph (a)(1) provided:

> *On the basis of available scientific information*, the interdisciplinary team shall estimate the effects of the changes in vegetation type, timber age classes, community composition, rotation age, and year-long suitability of habitat related to mobility of management indicator species.  Where appropriate, measures to mitigate adverse effects shall be prescribed.

*Id.* § 219.19(a)(1) (emphasis added).

Therefore, this is not a situation where USFS's consideration of the BAS would have involved a dramatic shift in the methodology it employed under the 1982 Rules. In contrast, the alternative arguments that the SEC advanced in *Chenery* were completely different. *See Chenery*, 318 U.S. at 92–93 (contrasting the SEC's argument in agency proceedings, where "it purported merely to be applying an existing judge-made rule of equity," with its additional argument before the Court , where it "rel[ied] upon 'its special administrative competence'"). Furthermore, while the 2000 transitional rules eliminated the need for site-specific projects to jump through the procedural hoops of the 1982 Rules regarding monitoring during the transitional period, as *UEC III* makes clear, the USFS was obliged to evaluate the environmental impact on the habitat of relevant species of proposed site-specific projects on the basis of the scientific information available, under the new BAS requirement. *See UEC III*, 443 F.3d at 746–47.

The USFS still had to comply of course with the dictates of specific forest plans, which often included monitoring requirements. The Carson Plan under which the A/C Project operated embodied extensive monitoring requirements. The "Monitoring Plan," J. App. at 138, indicates the monitoring method, frequency, expected precision/reliability, and other outputs that the Carson Forest Plan requires, *see id.* at 602. It further explains that the "population and habitat trends of management indicating species" and the "[p]opulation and habitat trends

of State and Federally listed plants and animals and sensitive species" will be the "[i]tems [m]onitored," *id.* at 602.

However, the fact that the USFS felt obliged under the Carson Plan to endeavor to clear the procedural hurdles set out in the 1982 Rules is immaterial to the *Chenery* question—that is, the question of whether the district court was required to vacate the agency decision because it failed to apply the BAS standard. As to that question, the relevant inquiry is whether "the agency *considered* the best available science," even though it "did not specifically *cite* the 2000 regulations requiring application of the best available science standard." *UEC VI*, 518 F.3d at 830. And we have answered that inquiry in the affirmative.[11]

In sum, we conclude that, even though it did not explicitly cite the 2000 transitional rules in formulating and finalizing the A/C Project, the USFS did exactly what the plain language of those rules directed it to do: "consider the *best available science* in implementing and, if appropriate, amending the current plan." 36 C.F.R. § 219.35 (emphasis added). Because it is clear from the record that the USFS considered and applied what it believed to be the best available science in approving the A/C Project, even if we assume that the practical effect of the district court's decision was to rule in favor of USFS on Forest Guardian's BAS challenge, *Chenery* would not bar this result.

_____

[11]    Indeed, the Monitoring Plan itself relied upon the "[p]oint-counting method developed by Reynolds." J. App. at 144.

## C. 16 U.S.C. § 1604(g)(3)(B)

Forest Guardians next asserts that the A/C Project runs counter to the Carson Forest Plan and the NFMA's substantive obligation to "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives." 16 U.S.C. § 1604(g)(3)(B); *UEC II*, 439 F.3d at 1188. Forest Guardians argues that the USFS's explanation for its approval of the A/C Project runs counter to the evidence that was before the agency. *See UEC III*, 443 F.3d at 739. Specifically, Forest Guardians contends that the approval was arbitrary and capricious because the project's detrimental effects on the Abert's squirrel is incompatible with the NFMA requirement to protect species diversity. Although the USFS argues that this project-specific argument should fail because the NFMA's statutory diversity requirements apply to forest plans rather than particular projects, we have recognized that individual projects, as well as the overarching forest plan, must comply with the NFMA. *UEC II*, 439 F.3d at 1188 (citing 16 U.S.C. § 1604(i)).

Forest Guardians' basic argument is that the A/C Project violates the NFMA substantive requirement to provide for diversity because, even though population levels for the Abert's squirrel are below the USFS's minimum viable population threshold and are declining, the A/C Project calls for the destruction of

-32-

additional squirrel habitat, which will lead to further decline in population.[12]  The

case that Forest Guardians cites for the proposition that the NFMA mandates the

maintenance of minimum viable populations of certain species as part of the

USFS's § 1604(g)(3)(B) obligation actually relies on a version of the now-

superseded 1982 Rules.  *See Idaho Sporting Cong., Inc.*, 305 F.3d at 961 (quoting

36 C.F.R. § 219.19 (1999)[13]).  The ROD for the A/C Project itself, however, does

prescribe that "viable populations" of MIS be maintained.  *See* J. App. at 291.

Even assuming that a failure to maintain a viable population of Abert's squirrel

could equate to a violation of the statutory diversity requirement of §

1604(g)(3)(B), however, Forest Guardians ultimately fails to carry its heavy

burden to establish that the USFS's conclusion regarding environmental impact

and the effect of the A/C Project on the Abert's squirrel ran counter to the

_____

[12]      Forest Guardians also had argued to the district court that the USFS's approval was inconsistent with the Carson Forest Plan because that plan required the Abert's squirrel be maintained at populations "greatly exceeding minimum viable populations."  Aplt. Opening Br. Attach. at 39–40, 45.  The district court rejected this argument, noting that while the "greatly exceeding" language had appeared in documents used in the planning process, it did not appear in the forest plan itself.  On appeal, Forest Guardians does not pursue this assertion.  Nor does Forest Guardians dispute that this language did not appear in the Carson Forest Plan or argue that it had been incorporated into the plan as a mandatory standard. *See Ecology Ctr. v. Castaneda*, 574 F.3d 652, 660 (9th Cir. 2009).

[13]      When in effect, 36 C.F.R. § 219.19 had read in part:  "Fish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area.  For planning purposes, a viable population shall be regarded as one which has the estimated numbers and distribution of reproductive individuals to insure its continued existence is well distributed in the planning area."

evidence before the agency.

The Carson Forest Plan itself specifically had been developed with favorable effects on the Abert's squirrel in mind: "By creating a diversity of stand conditions and providing juxtaposition of stands over time and space, suitable habitat components of Abert['s] . . . squirrels will be maintained over time."[14] J. App. at 137. Numerous planning documents and the ROD show the extensive analysis undertaken in connection with the A/C Project and reflect the USFS's rationale for its conclusion that the A/C Project is compliant with the Carson Forest Plan and the NFMA, including with regard to the Abert's squirrel. In its 2003 forest-wide MIS assessment, for example, the USFS collected and assessed data on the Abert's squirrel, including the effects of various management activities on its habitat types, its habitat trends, and quantitative population trend data and viability. The assessment noted that while "[i]ndiscriminate logging can degrade Abert's squirrel habitat," and "historic heavy harvesting" and fire suppression have resulted in a less diverse habitat in certain vegetation structural stages, the current habitat condition for the Abert's squirrel "is poor to fair, but in a slight upward trend." J. App. at 201.

This thorough assessment concluded that in contrast to historical practices,

_____

[14] *See generally* Patton, *supra* note 1, at 409 (noting that "unlike other tree squirrels, [the Abert's squirrel] does not store food for winter use" and is dependent on trees for its existence and that "[e]vidence and field experience indicate that tree density, size, and dispersion pattern contribute to squirrel habitat"); *see also supra* note 2 (offering definitions of "stand").

-34-

"[m]ore recent management has tended to focus on thinning from below" and "group selections across the Forest"—practices that "enhance[] Abert's squirrel habitat" and "that in turn should assure its survival." *Id.* at 202. Examining various sources of data, the MIS assessment concluded that the Abert's squirrel population in the Carson National Forest is "stable, but likely lower than potential" and they are "in no danger of extinction." *Id.* at 204. Overall, the USFS concluded, "the Carson National Forest is sustaining viable populations of Abert's squirrel. Continued implementation of prescribed burning and thinning should continue to improve the squirrel's habitat." *Id.*

The 2003 Supplement to the Final Environmental Impact Statement for the project considered the findings of that 2003 MIS assessment—including an extensive, Abert's-squirrel-specific examination of environmental factors, habitat conditions and trends, population trend and viability, and effect of proposed activities—and determined that, over the long term, implementation of any of the proposed alternatives for the A/C Project "would either maintain or improve habitat conditions and populations for [MIS]." *Id.* at 215. Also used in the planning process was the 2004 Final Supplement to the Final Environmental Impact Statement for the A/C Project. This report explained that twelve years of environmental analysis had gone into the A/C Project, extensively described habitat and population developments for the Abert's squirrel, and reported that the project "would maintain an upward trend for Abert's squirrel quality habitat

across the Carson National Forest." *Id.* at 247, 248–50. Thus, the ROD concluded that the A/C Project would "contribute to improving or maintaining [MIS] habitat and sustaining their populations on the Carson National Forest." *Id.* at 292. The ROD prescribed that prior to implementation of activities within squirrel habitats, stands within those habitats would be reevaluated for Abert's squirrel activity and treatments would be deferred within high-activity areas. *Id.* at 291.

We grant considerable discretion and deference to federal agencies on matters that require a high level of technical or scientific expertise. *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 377 (1989); *UEC III*, 443 F.3d at 739. Although Forest Guardians alleges that the evidence shows that there has been a decline in the Abert's squirrel population, that the population is below optimal levels, and that the decline was caused at least partly by USFS timber sales, we do not find that it has demonstrated that the agency's A/C Project decision runs counter to the evidence. Specifically, none of the evidence pointed to by Forest Guardians sufficiently supports its proposition that if "the USFS has authorized destruction of some of the Abert's squirrel remaining habitat" then it follows that "the A-C project decision violates the USFS's statutory duty" under the NFMA. Aplt. Opening Br. at 55. Forest Guardians points to isolated statements—contained in a 2003 report from a monitoring program initiated by the USFS—that note some declines in the Abert's squirrel population densities within the Carson National

Forest and conclude that logging and "intensive, widespread thinning" can have an adverse effect on the habitat and population of that species. J. App. at 229–30, 238. The report also opines that compared to previous estimates, the squirrel densities observed were extremely low after a major decline in 2002.

This same report, however, concluded that its density estimates might be artificially low due to the timing of the monitoring and that climate-related factors may account for some of the decline. "Though a party may cite studies that support a conclusion different from the one the Forest Service reached, it is not our role to weigh competing scientific analyses." *Castaneda*, 574 F.3d at 659. Running throughout Forest Guardians' argument appears to be the general assumption that any timber harvesting equates to negative effects on the Abert's squirrel habitat and population. Without more, Forest Guardians' sparse evidence and its unproven proposition cannot defeat the USFS's contrary conclusion. *See* J. App. at 202 ("Management practices of thinning from below and group selections across the Forest enhance[] Abert's squirrel habitat[, which] in turn should assure its survival."); *cf. Lands Council v. McNair*, 537 F.3d 981, 997 (9th Cir.) ("A habitat disturbance does not necessarily mean that a species' viability will be threatened."), *abrogated in part on other grounds by Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008), *as recognized by Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 & n.10 (9th Cir.2009).

We find that the USFS's approval was not arbitrary and capricious and its

explanation did not run counter to the evidence before it.  It was rational for the agency to conclude that the A/C Project was consistent with the mandates of the NFMA and the Carson Forest Plan, including in its effect on the Abert's squirrel. The USFS did not violate the NFMA's statutory requirement to provide for species diversity by approving the A/C Project.

### D.  16 U.S.C. § 1604(i)

Finally, Forest Guardians contends that the A/C Project is not consistent with the Carson Forest Plan's monitoring requirements and therefore violates the NFMA "consistency provision."[15]  16 U.S.C. § 1604(i); *Ohio Forestry Ass'n*, 523 U.S. at 730 (noting that before the USFS can begin a project it must "ensure that the project is consistent with the [applicable] Plan").  More specifically, Forest Guardians asserts that the A/C Project violates the requirement imposed to monitor population trends of MIS species in the site-specific project area.  The monitoring program of the Carson Forest Plan states:  "The purpose of monitoring and evaluating the implementation of the Forest Plan is to inform the decision

---

[15]    Although Forest Guardians previously had framed this argument as a violation of the monitoring requirements of the 1982 Rules, a deficient monitoring claim still may be viable, regardless of whether the 1982 Rules were incorporated into the applicable forest plan, if the monitoring provisions are part of the plan itself.  *UEC V*, 483 F.3d at 1135–36 ("[T]he Forest Service is obligated to apply the new regulations and is also bound to apply the terms of the 1986 forest plan, including the obligation to monitor the management indicator species listed in the plan, to the extent the plan does not conflict with the 'best available science' standard."); *see also* 36 C.F.R. § 219.14(f) (2005) (noting that the USFS must comply with plans developed prior to November 9, 2000, that "specifically require[] population monitoring or population surveys" for MIS).

maker of the progress toward achieving the goals, objectives, and standards and guidelines." J. App. at 138. Monitoring also will determine whether "standards are being followed" and "if the effects of implementing the Forest Plan are occur[r]ing as predicted." *Id.* As discussed above, the monitoring program requires that MIS be identified and that five years of baseline data of each MIS be collected, followed by periodic monitoring of MIS population and habitat trends. The A/C Project likewise adopted a monitoring plan, to be periodically assessed and updated, designed to apprise interested parties "of progress toward the goals and objectives" and "provide information on the impacts of [USFS] activities on [MIS] to ensure viable populations are maintained." *Id.* at 291.

Forest Guardians asserts that the USFS failed to comply with the monitoring requirements and methodologies of the Carson Forest Plan, including the requirement to acquire five years of baseline data, and thus the approval of the A/C Project is inconsistent with the plan. *Cf. UEC III*, 443 F.3d at 749 ("In essence, [the plaintiff] argues that the Forest Plan requires the collection of . . . data as a condition precedent to the approval of the . . . [p]roject."). Regardless of whether the A/C Project's monitoring is deficient, however, no cognizable claim regarding this alleged failure exists, because the project's approval was not conditioned upon meeting monitoring requirements. This court has clarified that while a forest plan's forest-wide monitoring program does not constitute final agency action, "we may review a monitoring program to the extent it bears on the

-39-

approval of a particular project." *Id.* "[I]f a project's approval is conditioned upon the fulfillment of certain monitoring obligations, a plaintiff may bring a claim of deficient monitoring. Without such a relationship, a claim of deficient monitoring simply is not cognizable." *Id.* at 750; *see also UEC V*, 483 F.3d at 1134 (noting that the plaintiff must establish "the required nexus" between the monitoring and the project approval).

While the Carson Forest Plan monitoring program does outline that MIS should be monitored, there is nothing in the program that conditions approval of any individual project—such as the A/C Project—on fulfillment of these monitoring goals. Indeed, the monitoring program appears to contemplate monitoring being conducted on a forest-wide, rather than project-wide, level, and, further, being "at best tentative and exploratory." J. App. at 149. The Carson Forest Plan is distinguishable from those in cases where we have found a showing of "the required nexus" between the monitoring and the project. In *UEC V*, for example, the forest plan prescribed that if certain conditions were revealed during the monitoring process, then further evaluation or a change in management direction could occur. *UEC V*, 483 F.3d at 1133. In other words, that plan laid out a specific standard that made the monitoring requirements a condition precedent to management activities. *Id.* at 1134. In *UEC II*, we found that a project approval by the USFS did not satisfy the monitoring provisions of the applicable forest plan with regards to the Mexican spotted owl. *UEC II*, 439 F.3d

at 1194. In that case, however, the forest plan contained species monitoring requirements designed to ensure that no decrease to any threatened, endangered, or sensitive animals resulted from "management activities." *Id.* That plan included a requirement that this "no decrease" standard be met, as demonstrated by the monitoring of the Mexican spotted owl. *Id.*

Forest Guardians has not pointed to any similar language demonstrating a connection between the Carson Forest Plan's monitoring program and the A/C Project, i.e., "no showing has been made that the applicable Forest Service regulations and directives conditioned approval" of the A/C Project "on the successful monitoring of [MIS] at either a forest-wide or project level" or on the meeting of a certain standard. *UEC III*, 443 F.3d at 750. Thus, we agree with the district court that Forest Guardians has no cognizable claim regarding USFS's alleged failure to comply with the monitoring requirements of the Carson Forest Plan.[16]

---

[16] The district court also noted that the structure of the Carson Forest Plan indicates that the monitoring was not meant to be a condition precedent to project approval:

> The Forest Plan was adopted in 1986, and at that time the USFS planned timber projects going forward beginning in 1987. *See* AR 000597-000599. If the USFS had intended the Monitoring Plan requirements to be condition precedents to site-specific project approval, then the USFS would have planned on being non-compliant and in violation of NFMA's consistency requirements the year after the Forest Plan was adopted, because it would have been impossible at that point to have five years of baseline MIS monitoring. Such an

(continued...)

# III. CONCLUSION

For the foregoing reasons, the judgment of the district court is

**AFFIRMED**.  Forest Guardians' pending motions to supplement the

administrative record and to file a supplemental appendix are **GRANTED.**

---

[16](...continued)
intention would have been inconsistent with the way the Forest Plan
was set up.

Aplt. Opening Br. Attach. at 41.  Unfortunately, the referenced pages of the
administrative record were not included in the parties' appendices, so we cannot
verify this reasoning.  Forest Guardians has not disputed this portion of the
district court's opinion, however.  *Cf. Ecology Ctr.*, 451 F.3d at 1192 n.3 (relying
on the excerpt of the document provided and assuming there were no relevant
provisions within the portion not provided).